Thomas WILLIAMS, Appellant,

v.

Louis W. SULLIVAN, M.D., Secretary
of Health and Human Services.

No. 91–6038.

United States Court of Appeals,
Third Circuit.

Argued May 19, 1992.

Decided July 14, 1992.

Rehearing and Rehearing En Banc Denied
Aug. 13, 1992.

Joel M. Solow (argued), Freeman & Bass, P.A., Newark, N.J., for appellant.

Michael Chertoff, U.S. Atty., Peter G. O'Malley (argued), Sp. Asst. U.S. Atty., Newark, N.J., for appellee.

Before HUTCHINSON, COWEN and GARTH, Circuit Judges.

## OPINION OF THE COURT

ROBERT E. COWEN, Circuit Judge.

This is an appeal from a denial of disability benefits under the Social Security Act, 42 U.S.C.A. § 301 *et seq.* (West 1991). Following a hearing in 1989, the administrative law judge found that appellant Thomas Williams was disabled as of March 28, 1988. Williams sought review by the Appeals Council regarding the date of onset of his disability, requesting that the Council award retroactive benefits back to December 1986. Upon review, the Appeals Council determined that Williams was not disabled at all. The district court affirmed the ruling of no disability by the Appeals Council. Because the Appeals Council acted within its discretion when it reviewed the case in full, and its conclusion that Williams was not disabled was supported by substantial evidence, we will affirm.

I.

Williams applied for disability insurance benefits on October 20, 1987, alleging disability as of October 1986. His claim was denied, and Williams took no appeal. On June 15, 1988, this time with the assistance of counsel, he filed a new application for disability insurance benefits, stating that his disabling condition was "orthopedic,

neurological, neuropsychiatric, psychiatric, psychological, pulmonary, internal, diabetic and conditions related thereto." App. at 82. His claim was again denied on December 15, 1988, and he exhausted his administrative remedies.

Williams appeared at an administrative hearing before an Administrative Law Judge (ALJ) on August 8, 1989. The ALJ issued a decision on August 24, 1989, finding Williams disabled as of March 28, 1988, but not earlier. Williams requested review by the Appeals Council regarding the date of onset of total disability. He asserted an onset date of total disability as of December 1986, and requested additional retroactive disability insurance benefits. On January 29, 1991, the Appeals Council issued a decision which held that, not only was Williams not entitled to an earlier date of onset of total disability, but he was not entitled to any disability benefits whatsoever. This decision was adopted by the Secretary.

Williams appealed this decision to the district court. The district court affirmed the Secretary's decision, finding that it was supported by substantial evidence. This appeal followed. We have jurisdiction under 28 U.S.C. § 1291 (1988).

## II.

### A.

Title II of the Social Security Act provides for the payment of disability insurance benefits to those who have contributed to the program and suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1)(D) (1988). "Disability" is defined in section 423(d) as follows:

(1) The term "disability" means—

(A) inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months

.   .   .   .   .

(2) For purposes of paragraph (1)(A)—

(A) An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.

.   .   .   .   .

(3) For purposes of this subsection, a "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

42 U.S.C.A. § 423(d) (West 1991). *See also* 42 U.S.C. § 1382c(a)(3)(A) (1988). The Secretary of Health and Human Services has established a five step sequential evaluation process for determining whether a person is disabled. 20 C.F.R. § 404.1520 (1991). The Supreme Court explained the operation of this sequential evaluation process thus:

The first two steps involve threshold determinations that the claimant is not presently working, and has an impairment which is of the required duration and which significantly limits his ability to work. In the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work. If the claimant's impairment matches or is "equal" to one of the listed impairments, he qualifies for benefits without further inquiry. If the claimant cannot qualify under the listings, the analysis proceeds to the fourth and fifth steps. At these steps, the inquiry is whether the claimant can do his own past work or any other work that exists in the national economy, in view of his age, education, and work experience. If the claimant cannot do his past work or other work, he qualifies for benefits.

*Sullivan v. Zebley,* 493 U.S. 521, 110 S.Ct. 885, 888–89, 107 L.Ed.2d 967 (1990).[1] The claimant bears the burden of persuasion through step four, while at step five, the burden shifts to the Secretary to show that the claimant is capable of performing substantial gainful employment other than the claimant's past relevant work. *Bowen v. Yuckert,* 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 2294 n. 5, 96 L.Ed.2d 119 (1987).

The Secretary concedes that Williams satisfies the requirements of the first two steps of the sequential evaluation process, i.e., that Williams was not working (step one) and had a "severe impairment" (step two). Williams does not, however, meet the requirements of step three, and there is substantial evidence to support the Secretary's decision at step four that Williams was capable of returning to his past relevant work as a security guard.

### B.

Williams was born in 1934. He went to a segregated school in South Carolina for less than one full year. He has the equivalent of only a first grade education, and is unable to read, write or do simple arithmetic. He did agricultural work in the South. Upon moving north, he did construction work for two years and then worked in a steel drum factory, where he performed various jobs including welding and "feeding the weld." He stopped working when the factory closed in 1983. Afterwards he worked as a security guard for about a year. At this job he spent his time walking or standing, and occasionally had to shovel snow. He stopped working in 1986.

Williams has arthritis and controlled diabetes for which he takes insulin daily. He takes medication for pain and walks with a cane. In preparation for his compensation case, he was examined in 1988 by five physicians and one psychologist for orthopedic, neuropsychiatric, and psychological disorders. Three of the doctors were Social Security consultative physicians, two of whom diagnosed Williams as having diabetes and arthritis. Two physicians, Drs. Ahmad and Pollock, were retained by Williams' counsel to perform orthopedic and neuropsychiatric exams, respectively. An IQ test administered by the psychologist yielded a verbal scale IQ of 66 on the Wechsler Adult Intelligence Scale.

The Administrative Law Judge found that Williams retained the residual functional capacity to perform the physical requirements of medium work[2] except for work requiring intellect to perform complex and detailed tasks. Although the ALJ concluded that Williams' work history did not indicate or reveal lifelong mental retardation, the ALJ nevertheless concluded that Williams' intellectual deficit was sufficient to establish disability. The ALJ held that Williams was "unable to perform his past relevant work as a welder and security guard in light of the decision in *Velazquez,*"[3] app. at 27, and found him under a "disability" since March 28, 1988, the date the psychologist administered the IQ test.

The ALJ concluded that Williams did not have an impairment or combination of impairments listed in, or medically equal to any listed in the regulations, 20 C.F.R. Pt. 404, Subpt. P., App. 1 (1991). Consequently, under step three of the sequential evalu-

1. The regulations implementing the Title XVI standard, 42 U.S.C. § 1382c(a)(3), at issue in *Zebley,* and those implementing the identical Title II standard, 42 U.S.C. § 423(d), at issue in this case, are the same in all relevant respects. *See Zebley,* 110 S.Ct. at 888 n. 3.

2. Medium work is defined as unskilled physical capacity to lift up to 50 pounds at a time, with frequent lifting or carrying of objects weighing up to 20 pounds. *See* 20 C.F.R. § 404.1567 (1991); 20 C.F.R. Pt. 404, Subpt. P, App. 2, Table No. 1, Rule 203.10 (1991).

3. *Velazquez v. Heckler,* 802 F.2d 680 (3d Cir. 1986) held that the Secretary must consider vocational factors at Step 4 of the sequence of the evaluation process. As discussed in text, *infra,* the ALJ misinterpreted our *Velazquez* decision and erroneously failed to consider Williams' ability to perform his past work. App. at 26. We note as well that the regulation at issue in *Velazquez* was superseded in 1990 and no longer requires consideration of vocational factors when determining a claimant's ability to perform past work. *See* 20 C.F.R. § 404.1560(b) (1991).

ation process, the ALJ stated that Williams could not be presumed disabled. Similarly, under step four, the ALJ found that "based on an exertional capacity for medium work, and the claimant's age, education, and work experience, section 404.1569 and Rule 203.10 & 203.18 (at onset), Table No. 1, Appendix 2, Subpart P, Regulation No. 4 would direct a conclusion of 'not disabled.'" App. at 27. Thus, despite concluding that the sequential evaluation procedure set out in the regulations would dictate a finding of "not disabled," the ALJ nevertheless found that Williams was disabled. The ALJ reasoned that Williams was unable to perform his past relevant work as a welder or security guard because of a recent reduction in intellect, which the ALJ found to be manifest as of March 28, 1988 but not before.

Upon review of the ALJ's findings, the Appeals Council concluded that the limitations on Williams' ability to perform work-related activities did not preclude the performance of his past work as a security guard. The Council found that Williams' only medically determinable severe impairments were arthritis and lumbar strain, and that he was still able to perform medium work. These impairments were neither listed in nor medically equal to any listed in the regulations. The Appeals Council did not consider Williams' mental impairments; instead it concluded that his allegations about inability to handle the demands of his past work were not credible. Consequently, the Appeals Council concluded that Williams was not disabled as defined in the Social Security Act at any time.

Our standard of review is whether the district court properly found that the Appeals Council's determination was supported by substantial evidence. *Brown v. Bowen,* 845 F.2d 1211, 1213 (3d Cir.1988). An appellate court is limited in its scope of judicial review as set forth in 42 U.S.C. § 405(g) (1988), which provides that a court may review the Secretary's factual findings only to determine whether they are supported by substantial evidence in the record. *Cotter v. Harris,* 642 F.2d 700, 704 (3d Cir.1981). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Kangas v. Bowen,* 823 F.2d 775, 777 (3d Cir.1987). Neither the district court nor this court is empowered to weigh the evidence or substitute its conclusions for those of the fact-finder. *Early v. Heckler,* 743 F.2d 1002, 1007 (3d Cir.1984).

### III.

■ Williams first challenges the Appeals Council's authority to review his entire case. He appealed one narrow issue, the onset date of his disability, but the Appeals Council reviewed his entire record and reversed the ALJ's determination of disability altogether. Williams asserts that this policy of wide open review is fundamentally unfair and violates due process because it chills a claimant's right to appeal by implicitly threatening the potential loss of benefits already granted.

Although an ALJ's findings of fact may be taken as conclusive, the Appeals Council may review all the evidence of record to decide whether the ALJ's findings are supported by substantial evidence. In *Powell v. Heckler,* 789 F.2d 176 (3d Cir.1986), this court held that the Appeals Council need not limit its review to the issue appealed, but may review a claimant's entire case provided it gives sufficient notice that appeals will be subject to full review. *Id.* at 179; *see also Hale v. Sullivan,* 934 F.2d 895, 898 (7th Cir.1991) (once the Appeals Council receives a timely request for review, it is entitled to review the entirety of the case); *Gronda v. Secretary of Health & Human Serv.,* 856 F.2d 36, 38–39 (6th Cir.1988) (Appeals Council had authority to review entire case within 60 days of ALJ's decision even though claimant only requested review of narrow aspect of case), *cert. denied,* 489 U.S. 1052, 109 S.Ct. 1312, 103 L.Ed.2d 581 (1989); *Bivines v. Bowen,* 833 F.2d 293, 297 (11th Cir.1987) (where claimant files application for review, Appeals Council may not revisit unchallenged issues unless it gives claimant notice); *Kennedy v. Bowen,* 814 F.2d 1523, 1524 (11th Cir. 1987) (Appeals Council must give notice of its intent to re-examine issues not challenged by claimant); *DeLong v. Heckler,*

771 F.2d 266, 267–68 (7th Cir.1985) (application for limited review of date of onset of disability gave Appeals Council the prerogative to broaden the scope of its review).

When Williams was first notified of the results of his hearing before the ALJ, he received a letter stating he had received a favorable decision. This letter contained a paragraph which put him on notice that if he appealed he might lose those benefits:

> When you appeal, you request the Appeals Council to review the decision. If the Appeals Council grants your request, it will review the entire record in your case. It will review those parts of the decision which you think are wrong. It will also review those parts which you think are correct and may make them unfavorable or less favorable to you. You will receive a new decision.

App. at 19. This paragraph was sufficient to put Williams on notice that if he appealed he risked losing his award.[4] Since this means of notification was reasonably calculated to apprise both Williams and his counsel of the risk associated with appealing the award, no due process violation can be found. *See Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314–15, 70 S.Ct. 652, 657–58, 94 L.Ed. 865 (1950).

"[F]undamental fairness requires that partly dissatisfied claimants ... be apprised of the risks inherent in their projected appeals." *Powell,* 789 F.2d at 180. Here, Williams received, along with the partially favorable hearing decision, a notice explaining his appeal rights. This notice, mailed directly to Williams and his attorney with the hearing decision, plainly stated that if an appeal were taken, the Appeals Council would review the entire record and might make a decision different from that of the ALJ.

Williams argues that the Appeals Council should have notified him within 60 days of the date of the hearing decision of the issues upon which it would review Williams' case. The 60–day limit upon which Williams relies, however, applies only to review initiated by the Council upon its own motion. 20 C.F.R. § 404.969 (1991). Here, Williams himself initiated the request for review. No mandatory deadlines apply to claimant-initiated requests. *See Heckler v. Day,* 467 U.S. 104, 115–117, 104 S.Ct. 2249, 2255–2256, 81 L.Ed.2d 88 (1984) (federal courts may not prescribe mandatory deadlines with respect to the administration of Social Security disability claims). In any event, because the notice explaining his appeal rights accompanied the letter notifying Williams of the favorable decision of the ALJ, it complies with 20 C.F.R. § 404.-969. There was no violation of due process in the Appeals Council's review of the entire record underlying the ALJ's decision.

## IV.

Williams next asserts that he qualifies for disability because his medical condition renders him disabled *per se* under step three of the sequential evaluation process. A claimant automatically qualifies for a period of disability if he or she suffers from an impairment listed in or equal to a list of impairments set out in the regulations at 20 C.F.R. Pt. 404, Subpt. P, App. 1. "For wage earners, the listings at step three of the sequential evaluation process provide a convenient way for the Secretary to determine which claimants are *per se* incapable of performing *any* gainful activity." *Finkelstein v. Sullivan,* 924 F.2d 483, 487 (3d Cir.1991) (emphasis in original).

---

4. We held in *Powell* that where a claimant makes a timely application for review of a limited issue, the Appeals Council must give notice within sixty days of the ALJ decision if it intends to undertake review on the merits beyond those framed by the claimant. 789 F.2d at 179. Because the Appeals Council failed to give timely notice of its intention to make a broader review of the record, it was limited to the onset date issue raised by Powell. *Id.* at 178–79. In

the present matter, however, the letter notifying Williams of his benefits award stated not only that the Appeals Council could exercise plenary review but also that the Council had the authority to review the decision on its own motion within 60 days. Regardless of which entity initiates review, the Council may consider the entire case provided it gives sufficient notice to the claimant of the scope of its review.

This court has paraphrased steps three through five of the sequential evaluation process thus:

A claimant may show an inability to engage in substantial gainful activity for a continuous period of twelve months in either of two ways: (1) by producing medical evidence that one is disabled *per se* by meeting or equalling certain listed impairments; or (2) by demonstrating an impairment of such severity as to be unable to engage in any kind of "substantial gainful work which exists in the national economy."

*Kangas,* 823 F.2d at 777. Williams claims he meets the criteria set forth in the listing of impairments for mentally retarded persons. Those criteria provide that

Mental retardation refers to a significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period (before age 22).

. . . . .

The required level of severity for this disorder is met when . . .

. . . . .

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. I, § 12.05. Under these criteria, a claimant is presumptively disabled if a) he is mentally retarded, as evidenced by an IQ between 60 and 70, and has been so since before the age of 22; and b) he has another impairment, in addition to the mental retardation, that imposes an additional and significant work-related limitation of function.

#### A.

With regard to the first requirement, Williams submitted evidence to support his claim of mental retardation, but the evidence was insufficient to substantiate a mental impairment existing prior to age 22. Williams submitted the report of Dr. Dyer, a psychologist, who diagnosed him as having a verbal IQ of 66 on the Wechsler

Adult Intelligence Scale (WAIS). Dr. Dyer's report concluded that Williams' "prospects for success would be virtually nil in any employment requiring complex oral communication, fine perceptual-motor skills, perceptual speed, rapid cognitive processing of large amounts of information, or basic reading, applied arithmetic, and written language skills." App. at 188. Dr. Dyer mentioned nothing about Williams' former employment in a steel drum factory or as a security guard.

■ Both the ALJ and the Appeals Council stated that Dr. Dyer's report was deficient since Dr. Dyer administered only a verbal IQ test rather than full scale and performance IQ tests as well. Section 12.-05(C) calls for a "valid verbal, performance, *or* full scale IQ of 60 through 70." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C) (emphasis added). Since the different types of IQ tests are separated by a disjunctive, the Secretary's position that a valid verbal score by itself cannot be acceptable is incorrect. The regulations make it clear that any well-standardized psychological test may be useful in establishing the existence of a mental disorder. The WAIS is given as an example of a useful test for establishing mental retardation, but the regulations do not require that the WAIS be used, nor do they require that the test be administered by a physician. Instead, the regulations state that "a standardized intelligence test, e.g. the WAIS, should be administered and interpreted by a psychologist or psychiatrist qualified by training and experience to perform such an evaluation." *Id.* at § 12.00(D). Under the regulations, therefore, a valid verbal scale IQ test administered by a qualified professional using the WAIS may be sufficient to establish mental retardation.

■ The Appeals Council also rejected Williams' claim of mental impairment because it found his evidence "not credible." Once a claimant has submitted sufficient evidence to support his or her claim of disability, the Appeals Council may not base its decision upon mere disbelief of the

claimant's evidence.[5]  Instead, the Secretary must present evidence to refute the claim.  *See Smith v. Califano*, 637 F.2d 968, 972 (3d Cir.1981) (where claimant's testimony is reasonably supported by medical evidence, the finder of fact may not discount the testimony without contrary medical evidence).

■ Williams' IQ score is not sufficient, however, to establish deficient intellectual functioning initially manifested during the developmental period (before age 22).  Dr. Dyer's report measured only his "current intellectual functioning," app. at 188, and did not document lifelong mental retardation.  The psychiatric reports of two other physicians were silent with respect to Williams' intellectual capacity.  A neuropsychiatric examination was performed by Dr. Pollock, who concluded only that Williams was depressed.  Dr. Shah, a psychiatrist, concluded that Williams did "not have any acute psychiatric problems at the present time."  App. at 176.  Neither physician administered intelligence tests.

Williams' mental retardation is further put into doubt by the fact that Williams did, in fact, maintain a job for most of his adult life.  The regulations indicate, in the context of mental retardation, that an ability to hold a job is "particularly useful in determining the individual's ability or inability to function in a work setting."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D).  In his testimony before the ALJ regarding his 22 years of employment at a steel drum factory Williams stated that he was able to learn new tasks.  He learned how to weld while on the job, for example.  Williams presented no evidence of a traumatic condition that would cause mental retardation to spring into existence at an adult age.  Even the ALJ found that "it is unclear as to what extent the claimant's limited IQ is due to his restricted and limited education as opposed to a deficit in native intellect. . . .  It may well be that the claimant has suffered a decrease in his intellectual ability recently due to his marked reduction in activity."  App. at 25.

5. Claimants may consult physicians who routinely prepare medical reports for Social Security claims.  Indeed, Williams' counsel, Freeman & Bass, often refer their clients to a small group of local physicians.  The credibility of these physicians' reports has often been questioned.  *See, e.g., Coria v. Heckler*, 750 F.2d 245, 249 (3d Cir.1984) (Garth, J., concurring); *Bradley v. Bowen*, 667 F.Supp. 161, 167 n. 2 (D.N.J.1987); *Franklin v. Heckler*, 598 F.Supp. 784, 789–833 (D.N.J.1984); *Winston v. Heckler*, 585 F.Supp. 362, 367–368 (D.N.J.1984).  Nevertheless, the finder of fact may not disregard medical evidence simply because it comes from a particular source or because the medical reports are similar to reports filed by counsel in other unrelated cases.  "The ALJ has a duty to hear and evaluate *all relevant evidence* in order to determine whether an applicant is entitled to disability benefits."  *Cotter*, 642 F.2d at 704 (emphasis added).

Judge Garth's concurring opinion, while carefully reasoned and meticulously researched, inaccurately paraphrases the majority's position with respect to the ALJ's discretion to evaluate medical evidence.  We agree that, in weighing the judgment of a physician and the credibility of his or her medical reports, the ALJ may consider the fact that the physician has made similar findings in like cases.  We cannot, however, accept Judge Garth's position that the ALJ may find medical reports so similar as to render them incompetent and unworthy of consideration at all.  Certainly, an ALJ has discretion to give little weight to a report if the ALJ con-

cludes, based on prior reports from the same physician, that the physician's judgment is flawed or entitled to little weight, based on rote medical findings in case after case.  But this is a long way from the position Judge Garth would take to disregard such reports altogether.

Professional medical reports, once received in evidence, may not be totally ignored, despite: having been prepared by a claimant's attending physician, *see Wallace v. Sec'y of HHS*, 722 F.2d 1150, 1155 (3d Cir.1983); containing conclusory language suggestive of irrelevant workers' compensation claims, *see Winston*, 585 F.Supp. at 367; or contradicting the ALJ's personal observations, *see Kelly v. R.R. Retirement Board*, 625 F.2d 486, 494 (3d Cir.1980).  Such medical reports, as well as others, may be suspect, but they are not incompetent.  We note that just as claimant's counsel tend to use their own consultative physicians, the government likewise time and again uses its own selected Social Security consultative physicians, whose medical reports may, to a lay reader, bear striking similarities from one case to the next.  Our bottom line is that the report of no physician, whether the claimant's or the Secretary's, should be treated as totally dispositive or incompetent.  Certainly, the ALJ was within his discretion in attributing little or no weight to the reports based on the reasoning of Judge Garth.  The ALJ could not, however, find such reports to be incompetent evidence.

Williams submitted evidence to the ALJ to support his claims, but the evidence was insufficient to substantiate his claim of disability under the regulations, which require that mental retardation exist before age 22. Because Williams did not meet his burden of production, the Secretary was not required to submit conflicting evidence to refute his claims.

■ In order to qualify for benefits at step three of the sequential evaluation process, a claimant must match or equal a listed impairment. "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Zebley*, 110 S.Ct. at 891 (emphasis in original). "For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Id.* (emphasis in original).

Williams failed to meet his burden of proving he was mentally retarded before age 22. He produced evidence of a significant mental impairment, but he did not demonstrate that its onset occurred during the developmental period identified in the listings. Had Dr. Dyer's evidence with respect to Williams' IQ been sufficient to show Williams was mentally retarded prior to age 22, the Secretary would have had to proffer evidence to counteract his claim of disability under the regulations. Dr. Dyer's evaluation was not sufficient to support Williams' claim of retardation prior to age 22, however, so Williams cannot be found disabled under step three of the sequential evaluation process.

### B.

■ With regard to the second prong of section 12.05(C), the requirement of an additional and significant work-related limitation of function, Williams argues that the Appeals Council improperly substituted its own finding concerning Williams' ability to perform his past relevant work for the finding of the ALJ. To the contrary, the Council properly reviewed the record and concluded that Williams did not satisfy the statutory criteria for a finding of disability. There is sufficient evidence in the record to support the Appeals Council's denial of benefits to Williams.

We have in this case a claimant who has worked hard all his life and who suffers from a combination of ailments, such as back pain, numbness in his left arm, and poor vision. He does not meet the statutory definition of disability, however, because he has failed to submit objective medical tests to show that his medical condition and residual capabilities satisfy the Social Security regulations. *See Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir.1990). His subjective complaints must be substantiated by medical evidence. 42 U.S.C. § 423(d)(3). Under the Social Security Act, the burden is on Williams to demonstrate by medical signs or findings that he is unable to work. *See* 20 C.F.R. at § 404.-1528. He must show that he has a condition which reasonably could be expected to produce the alleged symptoms that are the cause of his inability to work. *See Green v. Schweiker*, 749 F.2d 1066, 1069–70 (3d Cir.1984); 20 C.F.R. § 404.1529 (1991).

The doctors who examined Williams for his compensation case presented conflicting evaluations of his health. Williams presented medical evidence to account for a combination of conditions, none of which were severe enough to meet the criteria set out in the regulations. One of the Social Security consultative physicians, on the other hand, gave Williams a thorough examination and found only adequately-controlled diabetes and some arthritis which did not restrict Williams' movements. Another gave Williams an eye examination and a chest X-ray and found nothing unusual.

As we discussed with respect to Williams' mental impairment, the Appeals Council was not free to disregard the diagnoses of Williams' doctors in the absence of conflicting evidence. The fact-finder has an obligation to review all the evidence of record to decide whether or not the claim-

ant's testimony is credible. *Van Horn v. Schweiker,* 717 F.2d 871, 873 (3d Cir.1983). In determining whether a claimant is entitled to benefits under the Act, the Secretary has an obligation to weigh the medical evidence and make choices between conflicting medical evidence. *See Cotter,* 642 F.2d at 705. Williams submitted insufficient evidence to account for his back pain and eye problems; consequently the Secretary did not need to submit evidence to refute each of his claims.

Our standard of review dictates that we defer to the Secretary's findings of fact if they are supported by substantial evidence. Such support is present in this case. The record does not support the contention that Williams has an additional and significant work-related limitation of function.

### C.

■ A claimant who does not qualify for benefits under step three still has the opportunity to show that his impairment renders him statutorily disabled. If his "impairment is not one that is conclusively presumed to be disabling, the evaluation proceeds" to the fourth and fifth steps. *Yuckert,* 482 U.S. at 141–42, 107 S.Ct. at 2291–92. Step four of the sequential evaluation process is found at 20 C.F.R. § 404.-1520(e):

> *Your impairment(s) must prevent you from doing past relevant work.* If we cannot make a decision based on your current work activity or on medical facts alone, and you have a severe impairment(s), we then review your residual functional capacity and the physical and mental demands of the work you have done in the past. If you can still do this kind of work, we will find that you are not disabled.

The Appeals Council determined that Williams' residual functional capabilities would not prevent him from performing the physical and mental demands associated with his previous duties as a security guard. This determination was based upon substantial evidence.

Williams testified as to his duties as a security guard. None of his responsibilities reached the level of medium work as defined by 20 C.F.R. § 404.1567(c) (1991). Since the ALJ found Williams capable of medium work, Williams by definition retained the "residual functional capacity" to perform his past work as a security guard. "If the claimant is able to perform his previous work, he is not disabled." *Yuckert,* 482 U.S. at 141, 107 S.Ct. at 2291.

■ The ALJ declined to proceed to the fourth step in Williams' case, citing this court's decision in *Velazquez v. Heckler,* 802 F.2d 680 (3d Cir.1986). Instead, the ALJ proceeded directly to step five to consider whether Williams could perform other jobs existing in significant numbers in the national economy. The ALJ misinterpreted *Velazquez.* In *Velazquez,* this court held that under step four of the sequential evaluation process, the Secretary must consider vocational factors (age, education and work experience) in determining whether a claimant can do his or her past work. *Id.* at 682. The Secretary has since promulgated new regulations, which provide that, at step four, vocational factors are not considered in determining whether or not a claimant retains the residual functional capacity to perform past relevant work. 20 C.F.R. § 404.1560(b) (1991). The Appeals Council correctly found the ALJ's misinterpretation of *Velazquez* to be legal error.

Williams did not qualify for benefits at step three because his medical condition fell short of matching or equalling a listed impairment. The ALJ as finder of fact was required to proceed to step four. " 'If a claimant suffers from a less severe impairment' than the listed impairments, 'the Secretary must determine whether the claimant retains the ability to perform either his former work or some less demanding employment.' " [6] *Zebley,* 110 S.Ct. at 893–94 (quoting *Heckler v. Campbell,* 461 U.S.

---

6. About 25 percent of adult claimants qualify for benefits under steps four and five of the sequential evaluation process. House Committee on Ways and Means, 101st Cong., 1st Sess.,

Background Material and Data on Programs Within the Jurisdiction of the Committee on Ways and Means 46, *quoted in Zebley,* 110 S.Ct. at 894 n. 15.

458, 460, 103 S.Ct. 1952, 1953, 76 L.Ed.2d 66 (1983)). The ALJ determined that Williams, from an exertional standpoint, was capable of at least medium work, and there is no medical evidence in the record to establish a manifestation of limited intellectual functioning in the developmental period. The regulations therefore dictate that Williams be found not disabled.

> We will first compare your residual functional capacity with the physical and mental demands of the kind of work you have done in the past. If you still have the residual functional capacity to do your past relevant work, we will find that you can still do your past work, and we will determine that you are not disabled, without considering your vocational factors of age, education and work experience.

20 C.F.R. 404.1560(b).

■■■ Even if it could be found that Williams was unable to perform his past work as he described it, he would still have to show at step five that he could not perform gainful work in the national economy. *See Jock v. Harris*, 651 F.2d 133, 135 (2d Cir.1981). "The listings define impairments that would prevent an adult, regardless of his age, education or work experience, from performing *any* gainful activity, not just 'substantial gainful activity.'" *Zebley*, 110 S.Ct. at 892 (emphasis in original).

The standards for establishing disability are fairly strict. The regulations provide in part that

> The functional capacity to perform medium work represents such substantial work capability at even the unskilled level that a finding of disabled is ordinarily not warranted in cases where a severely impaired individual retains the functional capacity to perform medium work. Even the adversity of advanced age (55 or over) and a work history of unskilled work may be offset by the substantial work capability represented by the functional capacity to perform medium work.

20 C.F.R. Pt. 404, Subpt. P, App. 2, § 203.-00(b) (1991). Despite his impairments, Williams cannot be found disabled under the sequential evaluation process set out in the Social Security regulations.

## V.

The district court concluded that the Appeals Council properly reversed the ALJ's decision awarding benefits. Because Williams fails to qualify for benefits at step three of the sequential evaluation process and there is substantial evidence to support the Appeals Council's determination that none of Williams' ailments prevented him from working as a security guard, we will affirm the order of the district court.

GARTH, Circuit Judge, concurring:

### I.

I agree with the majority that the record reveals substantial evidence that Williams is not disabled. Indeed, the most that can be gleaned from the record is that Williams is arthritic and suffers from diabetes, which is controlled. Apart from the very questionable medical reports of Williams' physicians,[1] of which I shall say more later, no claim is made, nor does any suggestion appear, that Williams is unable to return to the same work in which he was last employed.

I write separately, however, because I strongly dispute the majority's toleration of boilerplate, stereotyped medical reports such as those presented in this case by Williams' counsel. The majority asserts, in dictum, that an administrative law judge may not disregard such medical "evidence" simply because the medical reports are similar to reports filed by counsel in unrelated cases. Maj. op. at 1185 n. 5. I cannot agree.

My thesis, which differs from that of the majority, is a simple one: I contend, and would hold, that if an administrative law judge is presented with medical reports

---

1. The physicians whose reports were submitted on behalf of Williams' claims are Doctors Hermele, Ahmad, Klein, Scannapiego, Pollock, Dyer and Matthews, all of whom were apparently engaged as consultative physicians by Williams' counsel.

from *any source*, including reports drawn by consultative physicians of the claimant or of the government, and if the administrative law judge recognizes these reports as mimicking, virtually word-for-word, reports submitted in connection with other, unrelated claimants, the administrative law judge should then be free to ignore or reject the reports as medical evidence.

I have written about this problem before, *see Coria v. Heckler*, 750 F.2d 245 (3d Cir.1984) (Garth, J. concurring), as have several district court judges, including former district court judge Frederick Lacey, *see Franklin v. Heckler*, 598 F.Supp. 784 (D.N.J.1984) and *Winston v. Heckler*, 585 F.Supp. 362, 367–68, (D.N.J.1984); and Judge Clarkson Fisher, *see Bradley v. Bowen*, 667 F.Supp. 161 (D.N.J.1987). Yet the problem persists, affecting both claimants and taxpayers and requiring the adoption of a prophylactic rule.

My overriding concern is that a claimant with a legitimate ailment or disability should not be denied benefits simply because the boilerplate medical evidence which is submitted on his behalf is non-particularized and therefore inadequate. To my mind, such a denial would be an abuse of the claimant's rights, generated by a failure of appropriate medical evidence and appropriate legal representation. By the same token, taxpayers should not be required to pay benefits for disabilities which do not exist and are either created by a physician's word processor, copier, or which are taken from his form file.

Thus, the failure to support a claim of disability with a professional and individualistic judgment not only operates against the claimant's interest, but, if we require administrative law judges to give weight or credence to such unprofessional reports, it cannot help but impose an unconscionable strain on the taxpaying public—a public which is already burdened with enormous social costs arising from

health care needs, disability benefits and the like.

## II.

The administrative law judge who heard Williams' claim, after considering the reports of Williams' physicians, chose to give their reports little weight. To understand the context in which the administrative law judge analyzed the "evidence" submitted on behalf of Williams, and to appreciate the concerns which constrained the administrative law judge in giving slight weight to that evidence, I take the rather unusual step of reproducing those parts of the administrative law judge's opinion which identify the very serious problems resulting from rote examinations and robotic diagnoses [2]:

> Prior to evaluating the objective medical evidence the Administrative Law Judge notes that the claimant's attorneys[, Freeman & Bass,] submitted a number of reports which were apparently prepared in connection with a worker's compensation claim. These reports were submitted by Dr. Hermele, Dr. Ahmad, Dr. Klein, Dr. Pollock and Dr. Matthews. These doctors frequently submit reports in cases heard by the Secretary and the undersigned is constrained to note that their findings and conclusions rarely vary from case to case and are carbon copy like in nature. Reports of these physicians have been reviewed frequently by the courts. Thus, in *Franklin v. Heckler*, 598 F.Supp. 784 (1984), the district court examined reports submitted by Dr. Pollock, Dr. Ahmad and Dr. Klein. It was noted that the physicians frequently prepared reports in Social Security claims and that with few exceptions these doctors' findings and conclusions were remarkably similar in report after report. The court further noted that such reports were properly afforded little if any weight. The undersigned notes that similar conclusions have been reached in other unreported cases refer-

---

2. In reproducing the administrative law judge's report, I have taken the liberty of correcting any typographical errors that appeared in the original text. I have also emphasized certain portions of the administrative law judge's opinion so as to call immediate attention to the issue that concerns me.

ring to reports from these and other doctors, including *Morrison* (CA 79–1962) and 81–1526, *Davis* (CA 83–2486) and *Iacova,* (CA 83–2646).... The undersigned fully considered the report of these physicians, delineated further below, but it is specifically noted that the carbon copy like nature of the reports cast significant doubt on their objective findings and conclusions.

\* \* \* \* \* \*

As noted, a number of reports were submitted which were prepared for a compensation claim. As noted as well, the undersigned frequently sees reports from these physicians and their findings rarely vary from case to case. In May of 1984 Dr. Matthews reported that the claimant suffered from rhinosinusitis and nasal pharyngitis. However, these conditions could be caused by something as simple as a cold and, more significantly, the claimant has been under no care for this nor did he have specific complaints referable to these problems at the hearing. Further, *the doctor always diagnoses these conditions* so that his conclusion is carbon copy like in nature and questioned. More significantly the claimant did not exhibit any significant hearing loss on an audiogram (Exhibit 27).

In the same month, May 1984, the claimant was examined by Dr. Scannapiego. The doctor found the claimant's corrected vision was essentially normal and found conjunctivitis and blepharitis [inflammation of the eyelids]. The undersigned notes that these conditions did not impair the claimant's vision significantly and more importantly *[Dr. Scannapiego] always diagnoses them.* They are, however, easily treatable, even assuming they are present. The undersigned does not find the presence of any significant vision problems (Exhibit 24).

Also in May of 1984 the claimant was examined by Dr. Hermele. The doctor concluded that the claimant suffered from restrictive lung disease. However, the doctor frequently submits reports to the Secretary which were originally prepared for compensation cases and *he generally makes such a diagnosis.* However, the claimant has not required any significant treatment, emergency or hospital care for such a problem. More significantly, while the doctor found increased pulmonary marking and increased heart size on x-rays, other reports, including 1984 hospital x-rays and the report of a consultative examiner fail to reveal similar findings. *Not only does Dr. Hermele make them in nearly every report he submits,* but increased pulmonary markings can be caused by smoking and need not be indicative of any objective active pulmonary disease.... In light of the lack of the treatment or care, the findings of a number of consultative examiners, the hospital record and the carbon copy like findings of Dr. Hermele it must be concluded that a pulmonary condition is not established at present.

The undersigned also finds it significant that the reports of Dr. Hermele, Dr. Klein and Dr. Matthews were performed in 1984 and the claimant was able to continue to keep working well after these reports were prepared. Also in evidence are more recent reports prepared in connection with the claimant's worker's compensation claim.

Dr. Pollock reported in January 1988 that the claimant suffered neurological residuals of exposure to fumes as well as an anxiety disorder, depression and an orthopedic impairment. However, the undersigned notes initially that numerous reports have been seen from this doctor originally prepared for compensation purposes. *His diagnosis rarely varies from case to case and is carbon copy in nature.* It is significant to note that the doctor found the claimant's gait was normal, coordination was intact, sensation was normal and motor findings showed no abnormality. However, the doctor did find tremors of the eyelids, tongue and fingers but he finds this in every case and no other physician noted this while there was swaying on the Romlerg no other physician noted this and *Dr. Pollock finds this in every case.* ... However, the undersigned cannot accord the doctor's conclusions great weight in light

of the fact that Dr. Shah performed a full consultative psychiatric examination and found no significant emotional condition and concluded that there was no acute psychiatric problem present. The undersigned further notes that the claimant has not sought out or required care for the condition and no other consultative examiner noted emotional problems nor did the hospital report of August 1984. In light of the carbon copy like nature of Dr. Pollock's reports and other objective evidence contrary a significant emotional problem is not established (Exhibit 25 and 20).

Also in evidence is a report from Dr. Ahmad dated January 25, 1988. The doctor concluded that the claimant suffered fibromyositis [inflammation of fibromuscular tissue] and spinal sprain. The undersigned notes that *Dr. Ahmad submits reports which are frequently seen by the undersigned as well as by the district courts, as noted above, and his findings and conclusions rarely vary from case to case being carbon copy like in nature.... However, the undersigned does not accord these findings great weight as the doctor generally lists the exact same restrictions in nearly every case in which a report is submitted....*

Also in evidence is a report from Dr. Dyer (Ph.D) a psychologist. This report was also, apparently, prepared for a compensation case and more significantly the doctor's report is markedly deficient.... The doctor frequently submits reports and generally does not provide a full range of scores nor, apparently, have the claimant's attorneys informed the doctor of the need to meet the Secretary's requirements. This is so despite the fact that these attorneys are well versed in the Secretary's regulations, appear frequently before him and the fact that such comments have been made in the past regarding the doctor's reports.

(A. 22–25) (emphasis added).

### III.

#### A.

As the administrative law judge observed, the medical reports submitted on behalf of Williams mimic, almost word-for-word, the medical reports which these same physicians have consistently submitted in the past on behalf of other claimants. As former district court Judge Lacey noted:

> [P]laintiff's representative, the law firm of Freeman and Bass, invariably submits these physicians' reports to support their clients' claims. After a review over several years of reports from each of these physicians, it must be said that the reports before me are of questionable weight.

> With few exceptions over the years, these physicians' findings and conclusions have been remarkably similar in report after report, while dealing with males and females of widely disparate backgrounds. They certainly do not reflect a highly individualized examination of the kind required in matters such as this.

*Franklin,* 598 F.Supp. at 790.

Clearly, as will be demonstrated below, the medical reports submitted by Freeman & Bass in the present case contain little more than the boilerplate language to which Judge Lacey referred in *Franklin.* Thus, those medical reports cannot constitute reliable expert or professional testimony and, in my opinion, should properly be rejected. I recognize, of course, that the administrative law judge in Williams' case did not reject this evidence outright, but rather analyzed it and, only after his recognition of virtually identical evidence in unrelated cases, determined that the evidence presented by Williams should be accorded little weight. Nevertheless, the majority, in its footnote 5, instructs in dictum that "the finder of fact may not disregard medical evidence simply because it comes from a particular source, nor because the medical reports are similar to reports filed by counsel in other non-related cases." Maj. op. at 1185 n. 5.

In my view, the majority has, like the proverbial ostrich, hidden its head in the sand by refusing to recognize the evils of a

practice which subverts the very purpose of the disability provisions of the Social Security Act—an act designed to provide benefits for the truly disabled. *See In re Petition of Sullivan*, 904 F.2d 826, 845 (3d Cir.1990) (identifying "Congress's intent in limiting disability benefits under the Social Security Act only to those who are unable to perform substantial gainful activity."). It is thus clear that the concerns expressed in the above-cited cases have not yet been adequately recognized by this court, leading the majority to state that an administrative law judge may not disregard medical reports that are similar to reports filed by counsel in other non-related cases even though the ALJ has identified the flaws in such reports after comparing them to other unrelated disability claims. I refer below to a sampling of instances where boilerplate, carbon-copy reports have been submitted as medical evidence in support of claims made by several different disability claimants.

**B.**

Dr. Samuel L. Pollock, a neuro-psychiatrist, diagnosed Williams, who had been employed as a security guard and as a worker in a steel drum factory, as suffering from "[n]eurological residuals of exposure to noxious fumes, dust and loud noise and post traumatic anxiety stress disorder, attributable to exposure at work." Dr. Pollock concluded that "[a]s a physiological industrial unit, regardless of cause, he appeared to be 100% disabled." (A. 185–86).

In *Franklin*, Judge Lacey documented several randomly selected medical reports which Dr. Pollock had submitted on behalf of Freeman & Bass clients. On July 26, 1979, Dr. Pollock diagnosed Adolfo Cruz, an outdoor maintenance worker, as suffering from "[n]eurological residuals of exposure to noxious fumes, dust and loud noise and traumatic anxiety psychoneurosis, also sciatic neuritis, attributable to accident and exposure at work." Dr. Pollock concluded that "[a]s a physiological industrial unit, regardless of cause, he appeared to be 100% disabled." 598 F.Supp. at 794.

On August 9, 1979, Dr. Pollock diagnosed Mary Franklin, a clothes presser, as suffering from "[n]eurological residuals of exposure to noxious fumes, dust and loud noise and traumatic anxiety psychoneurosis, also sciatic neuritis, attributable to accident and exposure at work." Dr. Pollock concluded that "[a]s a physiological industrial unit, regardless of cause, this petitioner appears to be 100% disabled." 598 F.Supp. at 793.

On July 24, 1980, Dr. Pollock diagnosed James Bryant, a painter, as suffering from "[n]eurological residuals of exposure to noxious fumes, dust and loud noise and traumatic anxiety psychoneurosis, also sciatic neuritis, attributable to accident and exposure at work." Dr. Pollock concluded that "[a]s a physiological industrial unit, regardless of cause, he appeared to be 100% disabled." *Id.* at 796.

On October 19, 1981, Dr. Pollock diagnosed Robert Lee, a construction laborer, as suffering from "[n]eurological residuals of exposure to noxious fumes, dust and loud noise and traumatic anxiety psychoneurosis, also sciatic neuritis, attributable to accident and exposure at work." Dr. Pollock concluded that "[a]s a physiological industrial unit, regardless of cause, he appeared to be 100% disabled." *Id.* at 795.

On September 22, 1983, Dr. Pollock diagnosed Eddie Felder, a laborer in a lumber factory, as suffering from "[n]eurological residuals of exposure to noxious fumes and dust and loud noise, also sciatic neuritis, and traumatic anxiety psychoneurosis, attributable to exposure at work." Dr. Pollock concluded that "[a]s a physiological industrial unit, regardless of cause, he appeared to be 100% disabled." Id. at 792.

Surely, an administrative law judge or a district court judge, when confronted with such undifferentiated medical reports, should feel free to regard them as entirely non-probative. A physician who identifies the same job-related ailment in every benefits claimant, regardless of the claimant's job or particular circumstances, is simply not credible.

## C.

In *Winston,* the district court judge noted that in each of three social security appeals then before him, Dr. Frank J. Dyer reported that the "perceptual rotations, fragmentations, simplifications, integration problems, and other gross distortions observed in this client's Bender Gestalt Test record are suggestive of a very severe visual-motor integration problem ..." 585 F.Supp. at 368 n. 5. Similarly, in the present case, Dr. Dyer reported that the "rotations, simplifications, perseverations, and other distortions observed in this client's Bender Gestalt Test record are suggestive of a severe visual-motor integration problem." (A. 187).

In the three reports cited in *Winston,* Dr. Dyer concluded that "[b]ased on the above findings, it is felt that [plaintiff's] prospects for success would be virtually nil in any employment requiring complex oral communication, fine perceptual motor skills, rapid cognitive processing of large amounts of information, or basic reading, arithmetic, and written language skills." 585 F.Supp. at 368 n. 5. In the present case, Dr. Dyer reached the same conclusion: "[b]ased on the above findings, it is felt that Mr. William's prospects for success would be virtually nil in any employment requiring complex oral communication, fine perceptual motor skills, rapid cognitive processing of large amounts of information, or basic reading, arithmetic, and written language skills." (A. 188).

Williams' remaining physicians similarly provided standardized diagnoses to Williams. Dr. Warren Klein, for example, diagnosed Williams as suffering from chronic conjunctivitis of both eyes, (A. 184), a diagnosis that he consistently gives to clients represented by Williams' present counsel. *See, e.g., Franklin,* 598 F.Supp. at 817–26.

## IV.

There is no reason why we should require administrative law judges to give any credence to physicians whose diagnoses are standardized and remain constant from claimant to claimant. I could register no objection to the testimony of Williams' physicians if they had discharged their responsibilities in a professional manner. I do, however, object to giving judicial recognition to the type of boilerplate medical reports submitted by Williams' physicians in this case, which have been documented as having been submitted in countless other cases in connection with unrelated claimants. This type of medical evidence can only have a disastrous effect on a claimant who may indeed have a serious physical ailment or mental disability, but who, having been diagnosed by rote and subject to the type of robotic diagnoses that I have catalogued here, cannot hope to succeed in having legitimate benefits awarded.

Unless we protect such individuals from this invidious practice and identify those who are responsible for subverting the very programs designed to benefit the disabled, we will be condoning and abetting the continuation of an exercise that should, instead, be condemned. How can we effect such a condemnation? We can do so, as I advocate here, by holding that an administrative law judge who recognizes and identifies such rote and undifferentiated reports should not accept them as competent medical evidence.

On the other hand, the mere fact that medical evidence in one case originates from a particular physician who may also have presented evidence in other cases should not taint that medical evidence, so long as the evidence is individualized and tailored to the particular claimant. In such a case, the evidence may be given whatever weight the administrative law judge deems appropriate, subject always, of course, to the evidence satisfying the requirements of the Secretary's regulations.

The majority justifies the use of undifferentiated medical reports by stating that "just as claimant's counsel tend to use their own consultative physicians, the government likewise time and again uses its own selected Social Security consultative physicians, whose medical reports may, to a lay reader, bear striking similarities from one case to the next." Maj. op. at 1185 n. 5. First, I do not comprehend the relevance of the majority's test, which is measured by whether a *lay reader* may

discern any similarities among medical reports. It is uncontroverted that the evaluation of such reports is the function not of lay readers but of experienced administrative law judges, and the review of those evaluations the task of the Secretary's Appeals Council, whose members are similarly familiar with and experienced in assessing medical evidence.

Second, it is significant to me that although the majority implies that consultative physicians engaged by the government file reports which may be construed as similar, the majority provides not a scintilla of evidence to support any comparison between the undifferentiated reports of the physicians consulted on Williams' behalf by Williams' counsel and the reports prepared by the government's consultative physicians. Before tarring the government's physicians with the same brush as the physicians who submitted Williams' reports, it would appear to me that *some* evidence, no matter how slight, should be cited. I therefore believe that it is grossly unfair for the majority to level such an unproven charge against the physicians consulted by the Secretary without providing even a shred of evidence, a case citation, or an example, supporting the inference that government physicians engage in the same practices in which Doctors Hermele, Ahmad, Klein, Scannapiego, Pollock, Dyer and Matthews have engaged. I myself have yet to read a report prepared by a government physician that parrots word-for-word diagnoses previously made by the same physician for a different patient, and I sincerely doubt that my colleagues who constitute the majority in this case have encountered such reports either. If they had, I am certain that they would have called them to my attention.

## V.

Despite the fact that the majority and I agree on the primary issue which confronts us, i.e., that substantial evidence supports the denial of benefits to Williams, I have digressed in writing this separate opinion to highlight my concern about a practice in the disability area that has become all too prevalent. That practice, which I condemn, and which I urge the court to condemn, is the practice of accepting as competent evidence, even though little weight may be given to it, stereotyped medical reports which contain virtually the same language and diagnoses regardless of the claimant and the claimant's condition.

Although the majority charges me with having misconstrued its position, I think a fair reading of my disagreement with the majority will not bear out that characterization. I acknowledge that the majority does not require more than mere consideration of boilerplate physicians' reports, with the weight to be accorded those reports left in the discretion of the administrative law judge. My position, however, is substantially different. I would authorize the administrative law judge to reject such evidence outright. The cases cited by the majority in its footnote 5, Maj. op. at 1185, which do not involve the same kind of rote medical reports that were submitted in this case, do not hold otherwise.

I agree with the majority that " '[t]he ALJ has a duty to hear and evaluate *all relevant evidence* in order to determine whether an applicant is entitled to disability benefits.' " Maj. op. at 1185, n. 5, *quoting Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir.1981). However, unlike the majority, I do not believe that undifferentiated medical reports, of the sort which were submitted on Williams' behalf, can possibly be considered "relevant evidence."

I therefore urge the court, in reviewing future disability appeals, to closely scrutinize the quality of the medical evidence submitted by claimants who are represented by the same counsel who represent Williams or, indeed, any counsel who engage in similar practices. Where the administrative law judge identifies the same egregious circumstances as I have documented here, I urge the court to hold that such judges are free to totally disregard and reject that evidence.

SUR PETITION FOR REHEARING

Aug. 13, 1992.

Before: SLOVITER, *Chief Judge;* BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, ROTH, and GARTH *, *Circuit Judges.*

---

* As to panel rehearing.

The petition for rehearing filed by appellant having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied.