

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-24-2000

# Knepp v. Comm Social Security

Precedential or Non-Precedential:

Docket 99-3420

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Knepp v. Comm Social Security" (2000). *2000 Decisions.* Paper 34.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/34

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed February 24, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-3420

DURWOOD B. KNEPP,

      Appellant

v.

KENNETH S. APFEL,
Commissioner of Social Security

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civ. No. 98-00091)
District Judge: Honorable Edwin M. Kosik

Argued January 24, 2000

BEFORE: GREENBERG, ROTH, and ROSENN,
Circuit Judges

(Filed: February 24, 2000)

        Warren R. Baldys (argued)
        416 Pine Street
        Suite 311
        Williamsport, PA 17701

         Attorney for Appellant

James A. Winn
Regional Counsel, Region III
Patricia M. Smith
Deputy Chief Counsel
Shawn C. Craver (argued)
Assistant Regional Counsel
Social Security Administration
OGC/Region III
P.O. Box 41777
Philadelphia, PA 19101

David M. Barasch
United States Attorney
J. Justin Blewitt, Jr.
Assistant United States Attorney
Middle District of Pennsylvania
William J. Nealon Federal Building
235 North Washington Avenue
P.O. Box 309
Scranton, PA 18501

 Attorneys for Appellee

OPINION OF THE COURT

GREENBERG, Circuit Judge.

I. INTRODUCTION

This matter is before the court on an appeal by Durwood
B. Knepp in this social security disability benefits case.
Knepp filed an application for disability benefits on March
25, 1994, alleging that he had been disabled as a result of
an accident on October 23, 1984. Knepp last had been
insured for benefits on June 30, 1991, and therefore must
show that he was disabled on or before that date to obtain
the benefits.

There was a hearing held before an administrative law
judge on April 3, 1997, following which on May 6, 1997, the
ALJ rendered her decision denying Knepp's application.
Knepp filed a request for review of the decision of the ALJ

on May 9, 1997, with the Appeals Council which denied his request on November 18, 1997. Thus, the decision of the ALJ became the final decision of the Commissioner of Social Security.

Thereafter, Knepp filed his complaint in the district court on January 20, 1998, seeking review of the Commissioner's final decision. The parties filed cross-motions for summary judgment that were assigned to a magistrate judge for a report and recommendation. On January 26, 1999, the magistrate judge recommended that the district court affirm the decision of the ALJ. On February 8, 1999, Kneppfiled an objection to the magistrate judge's report and recommendation, but by a comprehensive memorandum opinion and order entered March 31, 1999, the district court granted the Commissioner's motion for summary judgment.

The evidence in the case, as developed before the ALJ, is as follows. Knepp sustained severe injuries as a result of a high voltage electrocution on October 23, 1984, at his place of work. See app. at 73. Knepp testified that the electrocution "took off my left arm, my shoulders, down my back, blew both cheeks off my butt, the calves off my legs, the heels off my feet, toe off my left foot, and here on the abdomen." Id. at 25. At the time of the accident Knepp had been moving a welding machine when it came into contact with an overhead 17,000 volt power source. See id. at 94. Knepp required immediate hospitalization at North Carolina Memorial Hospital, and later continued treatment and rehabilitation at the Geisinger Medical Center in Pennsylvania. See id. at 94-99 (North Carolina Memorial Hospital report); id. at 100-141 (Geisinger Medical Center reports).

As a result of the injuries, Knepp was awarded disability insurance benefits from October 23, 1984 to May 31, 1986. In the application for benefits at issue now, Knepp alleged that he continued to be disabled as a result of the injuries he sustained in his October 1984 accident through his last insured date. These injuries included:

> 1) loss of his non-dominant left arm (amputated above the elbow joint);

3

2) loss of body mass in numerous areas, including the stomach, shoulder, back, buttocks, calves and heels of both feet;

3) loss of the fifth toe on his left foot;

4) burns to 34% of his body (with third degree burns over 20% of his body); and

5) residual pain associated with the electrocution.

See Admin. Tr. at 106 (disability report). Knepp explained that these injuries prevented him from working because the loss of his left arm "has affected balance and the ability to do any sort of construction work. Back injury with accident causes daily pain. Skin grafts on feet and calves crack and bleed." Id. Knepp testified at the hearing before the ALJ that he had not worked since his accident on October 23, 1984. See app. at 12. He stated, "I've tried several things and it just don't [sic] work." Id.

Knepp's last effort at working involved chores related to his family cattle farm. Knepp testified that, in particular, he was able to feed some of the cattle by filling a feed cart and pushing it. See id. at 13. Knepp did state, however, that there were times when he would need assistance. See id. Knepp spent approximately half of his day doing work on the farm.

Knepp testified that since 1989 he has experienced pain in his lower back. See id. at 15-16. Knepp stated that this pain affected his ability to walk.

> Well, there's time when you just can't hardly walk, you know, from the pain in the back, hip and, and legs. You, you got trouble walking, you got trouble sitting, you can't stand, I, even today, I can't stand at any period of time at all. I, you know, have to move a little or sit down or do something.

Id. at 16-17.

Knepp stated that he started treating his back pain in earnest in 1989 and 1990 with Dr. Bainey, a chiropractor, and Dr. Langton, a physician. See id. at 26. Knepp continues to see Dr. Langton and Dr. Rhodes, another

4

chiropractor. See id. Knepp stated that he has a constant, stabbing pain in his back. See id.

Knepp testified that he attempted to help with housework, but his wife did 90 percent of it. See id. at 19. Knepp also stated that he was capable of cooking meals and dressing and bathing himself without assistance. See id. Knepp was able to drive, and his automobile did not require any special adjustments to accommodate his injuries. See id. Knepp stated that on some days, however, he could drive only a couple of miles, although on other days he could drive for a half hour. See id. at 28. Knepp's ability to drive depended upon the state of his back and hip pain. See id. For relaxation, Knepp would take walks, sit somewhere, or watch television. See id. at 20. Knepp also stated that he was able to hunt and visit friends.

During the relevant time period Knepp took approximately three Tylenol 3, Motrin or ibuprofen 600s pills daily for his pain. See id. at 20. Knepp stated that while he was not "perfectly fine" while taking the medication, "it sure help[ed] .... it makes a big difference." Id. at 20-21. Knepp also testified that during the relevant time period he visited Dr. Langton three times per week for ultrasound therapy for his back. See id. at 21.

The ALJ called Dr. Peter G. Decker ("Dr. Decker"), a board certified internist, as a medical expert. Dr. Decker testified based upon his review of Knepp's medical records as he did not treat Knepp. See id. at 31. Dr. Decker testified that Knepp's impairments arose from his accident on October 23, 1984, and that the injuries Knepp sustained were the result of "exit" wounds caused by the high voltage electrocution. See id. at 32. Dr. Decker outlined Knepp's injuries, including the amputation of the left arm above the elbow, the trauma to the lower extremities, and the burns of the abdomen, lower and upper back, buttocks, left shoulder, and right leg. See id. at 32.

In response to the ALJ's question of whether Knepp's impairments met or equaled any condition specified in the Listing of Impairments contained at 20 C.F.R., Subpart P, App. 1 (1999) ("Listed Impairments"), Dr. Decker stated that no specific listing described Knepp's injuries. See id. at 34-35.

5

Dr. Decker testified that the most applicable listing of impairments was 1.13 and that 1.10 C was also relevant to Knepp's injuries. See id. at 35-38. Listing 1.10 C and 1.13 read as follows:

> 1.10 Amputation of one lower extremity (at or above the tarsal region): . . .
>
> C. Inability to use a prosthesis effectively, with out obligatory assistive devices, due to one of the following:
>
> 1. Vascular disease; or
>
> 2. Neurological complications (e.g., loss of posit ion sense); or
>
> 3. Stump too short or stump complications persiste nt, or are expected to persist, for at least 12 months from onset; or
>
> 4. Disorder of contralateral lower extremity which markedly limits ability to walk and stand.
>
> 1.13 Soft tissue injuries of an upper or lower extremity requiring a series of staged surgical proceedings within 12 months after onset for salvage and/or restoration of major function of the extremity, and such major function was not restored or expected to be restored within 12 months after onset.

20 C.F.R., Subpart P, App. 1 (1999) (emphasis added).

Dr. Decker testified that Knepp's burn injuries were analogous to the soft tissue injury requirement of Listed Impairment 1.13. See app. at 35. Dr. Decker explained that he considered the debridements and skin grafting procedures that Knepp underwent to be staged surgical procedures from which major functioning of the left arm never was restored because, even with the surgical procedures, Knepp could not be fitted with a functioning prosthesis. See id. at 34-35. Dr. Decker further testified that Knepp's heels could not be restored to major function because of severe tissue loss from burns. See id . at 35-36. Dr. Decker noted that in view of the combination of Knepp's injuries to his left arm and both feet, he would not expect Knepp to be able to walk or stand for long periods of time, and because of the injuries to the buttocks, he would not

6

be able to sit for prolonged periods of time. See id. at 35–37. Dr. Decker stated that he would expect Knepp to suffer chronic pain in both heels, back, and phantom pain in the arm. See id. at 33.

Based upon his conclusions, Dr. Decker stated that Knepp's condition equaled Listed Impairment 1.13 and that Listed Impairment 1.10 was applicable because of the number of factors present in that listing consistent with Knepp's condition. See id. Dr. Decker's testimony was limited to the application of the Listed Impairments. Dr. Decker did not make a determination as to Knepp's actual ability to perform light work that did not require use of the non-dominant upper extremity.

The ALJ also elicited testimony from a vocational expert concerning the availability of jobs for someone with Knepp's limitations. The ALJ asked the vocational expert to consider the situation of a younger individual, aged 47 to 49, with a high school education and history of semi-skilled labor, capable only of using his dominant right hand, and who had to alternate between sitting and standing. See id. at 41. It was further assumed that this individual was capable of lifting 10 pounds. See id.

The vocational expert concluded that there would be a significant number of jobs available to a person with the limitations provided by the ALJ. For example, the vocational expert testified that such a person would be able to perform jobs such as inspector, gate guard, cashier, or telephone solicitor. See id. at 43–44. The vocational expert did note, however, that the number of jobs available in the area of Pennsylvania where Knepp lived was likely to be significantly less than the number of jobs available in the state as a whole. See id. at 44–45.

As we mentioned, the ALJ issued her opinion on May 6, 1997. See app. at 71. She began her opinion by noting that Knepp already had received disability benefits between October 23, 1984, the date of his injury, and May 31, 1986. See id. at 71. Accordingly, the ALJ focused her inquiry on the period beginning June 1, 1986, and ending on June 30, 1991, the date Knepp last met the insured status requirements. See id.

7

Pursuant to her application of the required five-step analysis under the applicable regulations, the ALJfirst determined that Knepp had not been engaged in substantial gainful activity since June 1, 1986. See id. at 72. Second, the ALJ determined that the injuries resulting from Knepp's electrocution constituted a severe impairment. See id. at 73.

The third step of the regulation required the ALJ to determine whether Knepp suffered from an impairment, or combination of impairments, that either met or equaled a Listed Impairment. See id. The ALJ determined that, despite the testimony of Dr. Decker, Knepp did not suffer from an impairment or combination of impairments that either met or equaled a Listed Impairment. See id. The ALJ determined that Dr. Decker had not understood properly the scope of the provisions he cited as establishing disability on the part of Knepp. See id. at 74.

The ALJ then proceeded to the fourth and fifth steps of the analysis. At the fourth step, the ALJ determined that Knepp was unable to perform his past relevant work as a boilermaker. See id. at 75. At the fifth step, the ALJ concluded that Knepp had the residual functional capacity to perform work that does not require bi-lateral dexterity or use of the left arm; does not require lifting more than 10-20 pounds; allows for a sit/stand option; and does not require prolonged sitting, standing, or walking. See id . The ALJ determined that Knepp was not disabled because there were sufficient jobs available in the national economy within the limitations described above. See id .

The ALJ, in making her determination that Knepp was not disabled, took note of the scope of Knepp's injuries. See id. at 76-78. She observed that the treatment notes for Knepp through 1986 reflected that Knepp had healed well, began to regain body weight, and had begun to increase his activity level. See id. at 76. Further, the ALJ noted that while Knepp had received treatment for lower back pain beginning in 1990, such treatment consisted of conservative ultrasound pain management in 1990 and 1991 with virtually no medical intervention of any type from 1992 through 1995. See id. Accordingly, the ALJ determined that the evidence in the record did not support

8

a conclusion that Knepp was disabled before June 30, 1991. See id. at 76-77.

The ALJ found that Knepp's subjective complaints of pain were generally credible, but overstated to the extent Knepp claimed he had been unable to perform any work since June 1, 1986. See id. at 77. She noted that Knepp had received only conservative treatments during the period at issue, and no diagnostic testing or physical examinations were conducted prior to 1996. See id. Further, Knepp's daily activities supported the conclusion that he was capable of working during the period at issue. See id. Accordingly, Knepp was found not to have been disabled during the period beginning June 1, 1986 and ending June 30, 1991. See id. at 80. Thus, the ALJ denied the benefits.

II. DISCUSSION

While we exercise plenary review with respect to the order for summary judgment, our review of the ALJ's decision is more deferential as we determine whether there is substantial evidence to support the decision of the Commissioner. See Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999). Consequently, we are bound by the ALJ's findings of fact if they are supported by substantial evidence in the record. See id. We, however, exercise plenary review of all legal issues in this case. See Schaudeck v. Comm'r, 181 F.3d 429, 431 (3d Cir. 1999).

42 U.S.C. S 423(a)(1)(D) provides for the payment of benefits to persons who suffer from disabilities who have made contributions to the disability insurance program. In particular, 42 U.S.C. S 423(d)(1)(A) provides for the payment of benefits when a claimant establishes his or her inability:

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. SS 423(d)(2)(A) then explains that an individual

> shall be determined to be under a disability only if his [or her] physical or mental impairment or impairments

9

are of such severity that he [or she] is not only unable
to do his [or her] previous work but cannot,
considering his [or her] age, education and work
experience, engage in any other kind of substantial
gainful work which exists in the national economy....

In accordance with authority granted under 42 U.S.C.
S 405(a), the Commissioner has promulgated the
regulations applied by the ALJ to give effect to, and further
define, the provisions of the Act. See 20 C.F.R. SS 404.1520,
416.920 (1999). We reiterate that the regulations provide
for the five-step sequential evaluation of an individual's
claim for disability benefits that the ALJ applied in this
case. See Williams v. Sullivan, 970 F.2d 1178, 1180 (3d Cir.
1992).

In step one, the Commissioner must determine whether
the claimant currently is engaging in substantial gainful
activity. 20 C.F.R. SS 404.1520(a), 416.920(a) (1999). 20
C.F.R. SS 407.1572, 416.972 (1999). If a claimant is found
to be engaged in substantial gainful activity, his claim of
disability will be denied, regardless of the claimant's
medical condition. See Bowen v. Yuckert, 482 U.S. 137,
140, 107 S.Ct. 2287, 2291 (1987) (citing 20 C.F.R.
S 404.1520(b)). As mentioned, the ALJ determined that
Knepp had not engaged in any substantial gainful activity
during the period at issue. This determination is not
disputed.

If the claimant is not engaged in substantial gainful
activity, the analysis of the claim proceeds to step two. Step
two, commonly known as the "severity regulation," involves
a minimum threshold determination of whether the
claimant is suffering from a severe impairment. See 20
C.F.R. S 404.1520(c), 416.920(c) (1999). An impairment is
considered severe if it is "of a magnitude sufficient to limit
significantly the individual's `physical or mental ability to
do basic work activities.' " Santise v. Schweiker, 676 F.2d
925, 927 (3d Cir. 1982) (quoting 20 C.F.R. S 404.1520(c)
(1999)). The ability to do basic work activities is defined as

`the abilities and aptitudes necessary to do most jobs.'
Such abilities and aptitudes include `[p]hysical
functions such as walking, standing, sitting, lifting,

10

pushing, pulling, reaching, carrying, or handling';
`[c]apacities for seeing, hearing, and speaking';
`[u]nderstanding, carrying out, and remembering
simple instructions'; `[u]se of judgment';`[r]esponding
appropriately to supervision, co-workers, and usual
work situations'; and `[d]ealing with changes in a
routine work setting.'

Yuckert, 482 U.S. at 141, 107 S.Ct. at 2291 (quoting 20
C.F.R. S 404.1521(b) (1999)). An ALJ only considers medical
evidence in step two, without regard to vocational factors
such as the claimant's age, education, or work experience.
See id. (citing 20 C.F.R. SS 404.1520(c), 416.920(c) (1999)).
The ALJ determined that Knepp suffered from "severe"
impairments, as that term is defined by the Act, and that
finding is not in dispute.

If, as here, the claimant is not engaged in substantial
gainful activity and has a severe impairment, the evaluation
proceeds to step three. Step three requires a determination
of "whether the impairment is equivalent to one of a
number of Listed Impairments that the Commissioner
acknowledges are so severe as to preclude substantial
gainful activity." Yuckert, 482 U.S. at 141, 107 S.Ct. at
2291. "If the impairment meets or equals [a] [L]isted
[I]mpairment [ ], the claimant is conclusively presumed to
be disabled." Id., 107 S.Ct. at 2291; see also 20 C.F.R.
SS 404.1520(d), 416.920(d) (1999).

If a claimant does not suffer from a Listed Impairment or
its equivalent, the analysis proceeds to steps four and five.
Under these steps, the Commissioner "must determine
whether the claimant retains the ability to perform either
his [or her] former work or some less demanding
employment." See Sullivan v. Zebley, 493 U.S. 521, 535,
110 S.Ct. 885, 893-94 (1990) (internal quotation marks
omitted); see also, Williams, 970 F.2d at 1187.

On this appeal, Knepp challenges only the conclusion
that there was substantial evidence in the record to support
the finding of the ALJ that he did not meet or equal the
requirements of Listed Impairment 1.13 or 1.10. Knepp
does not assert that he should have been found disabled
pursuant to any other Listed Impairment. In addition,

11

Knepp does not challenge the findings of the ALJ relevant to his ability to perform the requirements of a limited, but sufficiently available, number of light work positions. Accordingly, Knepp can succeed on this appeal only if we find that the conclusions of the ALJ relevant to Listed Impairments 1.13 and 1.10 are unsupported by substantial evidence or were contrary to the law. Thus, this appeal is limited to a challenge to the ALJ's step three determination.

In view of the limited nature of Knepp's appeal, he sets forth the sole issue for our consideration as follows:

> Was it improper for the Commissioner to reject the testimony of Peter G. Decker, MD, a medical expert, who testified at the hearing before the Administrative Law Judge, that the Appellant's impairment was so severe that it equaled the severity set forth in the Listing of Impairments.

Appellant Br. at 1. As we demonstrate below, the resolution of this question in the circumstances here turns primarily on questions of law and not on questions of fact. Thus, we are exercising plenary review.

The Listed Impairments define impairments that prevent an adult, regardless of age, education, or work experience, from performing any gainful activity. See Zebley , 493 U.S. at 532, 110 S.Ct. at 892. Thus, as we have indicated, if a claimant's impairments meet or equal a Listed Impairment disability is conclusively established and the claimant is awarded benefits.

Knepp, citing 20 C.F.R. S 404.1526(c) (1999), argues that only a physician designated by the Commissioner can decide the question of medical equivalency. See Appellant Br. at 9. This argument misapprehends 20 C.F.R. S 404.1526. The ultimate decision concerning the disability of a claimant is reserved for the Commissioner. See 20 C.F.R. S 404.1527(e) (1999).

The regulations provide the following guidelines for determining if a claimant's impairments meet or equal a Listed Impairment.

> (a) How medical equivalence is determined. We will decide that your impairment(s) is medically equivalent

to a listed impairment in Appendix 1 if the medical findings are at least equal in severity and duration to the listed findings. We will compare the symptoms, signs, and laboratory findings about your impairment(s), as shown in the medical evidence we have about your claim, with the medical criteria shown with the listed impairment. If your impairment is not listed, we will consider the listed impairment most like your impairment to decide whether your impairment is medically equal. If you have more than one impairment, and none of them meets or equals a listed impairment, we will review the symptoms, signs, and laboratory findings about your impairments to determine whether the combination of your impairments is medically equal to any listed impairment.

(b) Medical equivalence must be based on medical findings. We will always base our decision about whether your impairment(s) is medically equal to a listed impairment on medical evidence only. Any medical findings in the evidence must be supported by medically acceptable clinical and laboratory diagnostic techniques. We will also consider the medical opinion given by one or more medical or psychological consultants designated by the Commissioner in deciding medical equivalence. (See S 404.1616.)

(c) Who is a designated medical . . . consultant. A medical . . . consultant designated by the Commissioner includes any medical . . . consultant employed or engaged to make medical judgments by the Social Security Administration, the Railroad Retirement Board, or a State agency authorized to make disability determinations. A medical consultant must be a physician.

20 C.F.R. S 404.1562 (1999).

In rejecting the testimony of Dr. Decker concerning the applicability of Listed Impairment 1.13, the ALJ stated:

I am unable to accept Dr. Decker's testimony that the claimant's condition continues to equal the severity requirements of Listing 1.13 in the light of my re-

13

examination of the medical record. In the present case, the claimant's left arm required amputation immediately following his injury. He did not undergo a series of surgical procedures and restoration of function was clearly not anticipated.

App. at 73-74.

While we seem not to have addressed the proper scope of Listed Impairment 1.13, the ALJ's construction of that listing was consistent with that of the courts of appeals that have addressed the issue. The Court of Appeals for the Seventh Circuit has determined that Listed Impairment 1.13 is:

directed to the loss of the use of one extremity, not in itself disabling under the regulations, where restoration of function will require repeated staged surgical procedures over a lengthy period, thus making an individual who would otherwise be capable of substantial gainful employment unavailable for work because of these repeated surgical procedures.

Waite v. Bowen, 819 F.2d 1356, 1359 (7th Cir. 1987). The Court of Appeals for the Sixth Circuit has agreed with this interpretation, concluding that Listed Impairment 1.13 is meant to address a claimant who is rendered disabled as a result of being unavailable for employment during the course of the staged surgical procedures and recovery periods. See Lapinksy v. Secretary, 857 F.2d 1071, 1073 (6th Cir. 1988). Accordingly, the courts construe Listed Impairment 1.13 as applicable only to persons undergoing surgical procedures designed to restore functionality.

In Waite, the court considered a claimant whose left arm had been paralyzed completely and permanently in a motorcycle accident. See Waite, 819 F.2d at 1358. The claimant also had suffered leg injuries that had healed. See id. The claimant argued that his paralyzed left arm met or equaled the requirements of Listed Impairment 1.13. See id. at 1359. The court, however, determined that Listed Impairment 1.13 was not met or equaled by simply any form of loss of use of an extremity for 12 or more months. The court there concluded that Listed Impairment 1.13 was

14

established to allow a period of recovery for surgical restoration of an impaired limb. See id. at 1360.

This interpretation of Listed Impairment 1.13 is 833<!>reasonable given its emphasis on staged surgical

proceedings and the restoration or salvage of functionality. Further, Listed Impairments 1.09 and 1.10 directly address amputations. Listed Impairment 1.09 requires the loss of both hands, both feet, or one hand and one foot in order for a claimant to be found conclusively disabled. See 20 C.F.R., Subpart P., App. 1 (1999). Listed Impairment 1.10 allows for a finding of disability upon the amputation of a lower extremity above the tarsal region. See id. Any reading of Listed Impairment 1.13 that would allow for a finding of disability upon the amputation of one extremity would place 1.13 in conflict with 1.09,[1] a provision expressly addressing amputation, and would render 1.13 and 1.10 mere redundancies. Consequently, we are convinced that the Courts of Appeals for the Sixth and Seventh Circuits have advanced a construction that provides the proper understanding of Listed Impairment 1.13.

Accordingly, as with the claimant in Waite, Knepp could be found to meet or equal Listed Impairment 1.13 only if, during the time period at issue, which ended on June 30, 1991, his impairments, when viewed as a whole, met or equaled surgical procedures designed to restore the functioning of his left arm. The medical record does not contain any facts which could support such a conclusion. Review of the medical records demonstrates that Knepp did not undergo any surgical proceedings during the period beginning June 1, 1986, and ending June 30, 1991, nor has Knepp pointed to any evidence of a procedure equivalent to restorative surgery that occurred during the

_____

1. For example, Listed Impairment 1.09 clearlyfinds that only the amputation of both hands, or the amputation of one hand and one foot are severe enough to warrant a presumption of disability. If Listed Impairment 1.13 were to be read as Knepp suggests, a claimant could be found to be presumptively disabled upon the loss of only one hand if the claimant had undergone operations to allow for thefitting of a prosthesis. Such a reading of Listed Impairment 1.13 would be inconsistent with Listed Impairment 1.09, a provision directly addressing the effects of amputation.

15

time period at issue. Rather, Knepp underwent the debridements and skin grafting procedures prior to that period.

Knepp's arguments that his impairments meet or equal Listed Impairment 1.13 all rest upon a misapprehension of the scope of that provision. For example, Knepp argues that the ALJ erroneously relied upon the fact that all of Knepp's surgical procedures occurred immediately following his accident, during a period for which he was provided disability benefits, and not during the period here at issue. See Reply Br. at 2-3. Given that Listed Impairment addresses only those situations in which the surgical procedures themselves contribute to the claimant's inability to work, the fact that Knepp did not undergo any surgical procedures after June 1, 1986, is determinative.

Knepp also argues that the ALJ should not have disregarded Dr. Decker's opinion because there are no medical opinions in the record contrary to his position. See Appellant Br. at 13-14; Reply Br. at 3. Contrary to the assertion of Knepp, the fact that the ALJ disregarded the opinion of Dr. Decker does not demonstrate that the ALJ simply was asserting her own medical opinion over that of the medical expert. Rather, the ALJ in this case properly did not accept Dr. Decker's opinion because the doctor asserted that Knepp's impairments met or equaled a Listed Impairment that is simply inapplicable to this matter.

Further, Dr. Decker also appears to have misapplied Listed Impairment 1.10 C. Dr. Decker asserted, and Knepp now argues, that 1.10 C is relevant because Knepp suffered injuries to both of his heels, experienced balance difficulties as a result of the loss of his left arm, and was not able to use a prosthesis effectively. See Appellant Br. at 15. Listed Impairment 1.10, however, expressly is concerned with the amputation of a lower extremity. See 20 C.F.R., Subpart P, App. 1. The inability to use a prosthesis, as contemplated by 1.10 C, clearly is meant to be a prosthesis designed to replace the amputated lower extremity, and not simply trouble with any prosthesis. In addition, we find no support in Dr. Decker's testimony, or elsewhere in the medical record, for the conclusion that Knepp's impairments to his heels and calves equaled the amputation of a lower

16

extremity. It would appear that, as a matter of law, Listed Impairment 1.10 has no applicability to the instant action.

Knepp essentially argues throughout his submissions that a decision concerning the applicability of a Listed Impairment is a medical decision. But that argument cannot overcome the circumstance that the medical expert attempted to apply provisions of the regulations that were not applicable to this case as a matter of law.

III. CONCLUSION

For the reasons we have stated, the order of the district court entered March 31, 1999, granting summary judgment will be affirmed.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

17