**Jocelyn RIOS o/b/o Andre Alvarez, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.**

No. CIV.A. 04–2067.

United States District Court, E.D. Pennsylvania.

March 29, 2005.

Sharon Gornstein, Langhorne, PA, for plaintiff.

## ·ORDER

SCHILLER, District Judge.

AND NOW, this day of, 2005, upon consideration of the parties' Motions for Summary Judgment, and after careful review of the Report and Recommendation of United States Magistrate Judge Arnold C. Rapoport, IT IS ORDERED that 1. the Report and Recommendation is APPROVED and ADOPTED;

2. the Plaintiff's Motion for Summary Judgment is GRANTED in part;

3. the Defendant's Motion for Summary Judgment is DENIED; and

4. the matter is REMANDED for further proceedings consistent with the Report and Recommendation.

## REPORT AND RECOMMENDATION

RAPOPORT, United States Magistrate Judge.

Plaintiff, Jocelyn Rios, brings this action on behalf of her minor son, Andre Alvarez ("Plaintiff"), under 42 U.S.C. section 1383(c)(3), which incorporates 42 U.S.C. section 405(g) by reference, to review the final decision of the Commissioner of Social Security ("Defendant"), denying Plaintiff's claim for child Supplemental Security Income ("SSI") provided under Title XVI of the Social Security Act ("Act"). Presently before this Court are the parties' Motions for Summary Judgment. For the reasons that follow, it is recommended that Plaintiff's Motion should be granted in part and the matter should be remanded for further proceedings.

### PROCEDURAL HISTORY

On January 9, 2002, Plaintiff applied for SSI on behalf of Plaintiff, a minor, alleging that he was disabled by attention deficit hyperactivity disorder ("ADHD").[1] (R. 47–51.) The state agency denied Plaintiff's application on August 3, 2002. (R. 29–32.)

On March 18, 2003, an administrative law judge ("ALJ") held a hearing at Plaintiff's request. (R. 228–255.) Plaintiff and Plaintiff's mother, who were represented by a paralegal specialist with Community Legal Services, testified at the hearing. (R. 228–255.) On August 18, 2003, the ALJ issued a decision finding that Plaintiff

was not disabled under the Act. (R. 16–26.) Plaintiff timely submitted a request for review of the ALJ's decision. (R. 11–12.) On September 26, 2003, the Appeals Council affirmed the ALJ's decision. (R. 8–10.)

Having exhausted all administrative remedies, Plaintiff filed this civil action on May 13, 2004, seeking judicial review of the Commissioner's decision. The matter was referred to this Magistrate Judge for a report and recommendation on December 17, 2004.

### FACTS

Plaintiff was born on June 4, 1992. (R. 16.) He was eleven years old at the time of the ALJ's decision. (R. 16–26.) Plaintiff alleges disability based on his mental impairments. (R. 16.) Plaintiff's medical history, including records submitted after the administrative hearing, includes diagnoses of ADHD, an Anxiety Disorder, and an Oppositional Defiant Disorder. (R. 118–227.) The record contains the testimony of Plaintiff and Plaintiff's mother. (R. 229–255.) The record also contains the ALJ's decision, disability reports, teacher/counselor questionnaires, academic records, a medication list, and medical evidence from various sources, including treating sources and consultative examinations.

The earliest documented medical treatment for psychiatric care of Plaintiff is from April 2000, when Plaintiff was seven. (R. 140–160.) These treatment notes indicate a reported "history of psychiatric treatment since age two." (R. 136, 160.) Plaintiff's mother reported that when Plaintiff was two he was diagnosed with ADHD and prescribed Ritalin, which caused aggressive and overactive behavior. (R. 136, 164.)

---

1. The record shows that Plaintiff was also diagnosed with Anxiety Disorder, Oppositional Defiant Disorder, and Depression. (R. 215, 222.)

In April 2000, Plaintiff began treatment at Northwestern Human Services. (R. 140, 164–165.) During the initial evaluation, Plaintiff's mother disclosed a family history of psychiatric disorders, including Plaintiff's uncle diagnosed as schizophrenic, the maternal grandmother diagnosed with depression, and the biological father's history of substance abuse.[2] (R. 136.) Additionally, Plaintiff's mother reported her own diagnosis of bipolar disorder and a history of drug and alcohol abuse. (R. 136.) Plaintiff's mother reported that Plaintiff had trouble accepting the death of his uncle two years earlier, with whom he had a close relationship. (R. 136.) At the time of the evaluation in April 2000, Plaintiff was living with his mother, his mother's boyfriend, and Plaintiff's younger sister, whom he was reported to be jealous of. (R. 136.)

On examination, Plaintiff was described a neat and cooperative but easily distracted, and he displayed psychomotor hyperactivity. (R. 138.) Plaintiff was diagnosed with ADHD and dysthymic disorder. (R. 139.) Plaintiff's global assessment of functioning ("GAF") was fifty. (R. 139.) Psychiatric evaluation, family therapy, and individual therapy were recommended. (R. 139.)

The record contains numerous medication sheets from Northwestern Human Services, which are often nearly illegible. (R. 124–127, 130–132, 143, 167–179.) However, it appears that Plaintiff was prescribed Adderall since at least August 1, 2000, and was additionally prescribed Remeron shortly thereafter. (R. 171.) Plaintiff's prescription for Adderall continued through about May 15, 2002, when it was discontinued and Ritalin was added. (R. 177.) In July 2002, Plaintiff's prescription for Ritalin was discontinued because it caused increased hyperactivity. (R. 176–178.) In July 2002, Plaintiff was placed back on Adderall for about a month, when despite increasing doses, it was deemed ineffective and to cause adverse side effects such as nightmares, talking in his sleep, sleepwalking, and being unable to eat. (R. 174–176.)

Throughout much of 2002, Plaintiff's therapist at Northwestern Human Services noted that Plaintiff was preoccupied with death; he had crying spells; he experienced difficulty organizing his thoughts; he exhibited symptoms of pressured speech; he had difficulties sleeping and eating when depressed; and he was sleepwalking. (R. 171–174.) In August 2002, Plaintiff told his therapist that "[his] head is messed up and confused;" "[he] can't catch [his] thoughts;" and it felt like "a bunch of people are talking to [him]." (R. 173.) Plaintiff also often made suicidal statements, such as "I don't like this life" and "I hate life." (R. 174.) Additionally, Plaintiff reported he thought that people on television were observing him. (R. 174.) On August 11, 2002, Plaintiff's therapist discontinued Adderall and recommended getting Andre into an acute partial hospitalization program to adjust his medications under increased supervision. (R. 172.)

On July 2, 2002, Daniel H. Schwartz, Ph.D., examined Plaintiff at the request of the state agency. (R. 149–152.) Upon examination, Dr. Schwartz noted some pressured speech and that Plaintiff tended to repeat himself frequently. (R. 150.) Dr. Schwartz noted that Plaintiff needed assistance to organize himself, and there were indications that Plaintiff spoke of sui-

2. Subsequent records indicate further reports of family history of mental disorders. (R. 208.) Plaintiff's maternal grandfather reportedly suffers from anxiety and depression; Plaintiff's maternal great uncle reportedly committed suicide; and Plaintiff's paternal grandmother may also have behavioral problems and mental illness. (R. 208.)

cidal ideation in the past. (R. 150.) Plaintiff's mother reported that Plaintiff was impulsive and sensitive, and he tends not to follow directions. (R. 150.) Dr. Schwartz noted that "there are some social skills issues present." (R. 150.) Dr. Schwartz also noted some lying behavior and stealing. (R. 151.) Dr. Schwartz further found that "there are indications of perceptual disturbances at times." (R. 151.) Plaintiff's self-esteem and mood and affect were within normal limits, with the exception of anxiety symptoms around sleeping. (R. 151.) Dr. Schwartz noted indications of domestic abuse and a tumultuous family history. (R. 151.) Dr. Schwartz stated that Plaintiff's mother has been unstable, "both psychiatrically and in the choice of men in her life." (R. 151.) Dr. Schwartz opined that Plaintiff's GAF was sixty and his prognosis was good "as long as the claimant continues to attend ongoing outpatient psychiatric and psychological therapies." (R. 151.)

On July 30, 2002, James J. Cunningham, Ed.D., reviewed the medical evidence of record and opined that Plaintiff's ADHD and dysthymic disorder were severe impairments that did not meet, equal, or functionally equal a listed impairment. (R. 156.) Specifically, Dr. Cunningham found that Plaintiff had no limitations in acquiring and using information, moving about and manipulating objects, caring for self, and health and physical well-being, and Plaintiff had less than marked limitations in attending and completing tasks and in interacting and relating with others. (R. 161.) Dr. Cunningham noted that Plaintiff had been doing well in school lately but that Plaintiff did require some structure to perform well. (R. 158.)

On August 16, 2002, Plaintiff was evaluated at Albert Einstein Medical Center Department of Psychiatry. (R. 195–205.) Upon examination, Plaintiff exhibited increased level of activity and irritability, and he was found to have poor judgement and insight. (R. 201.) The examining psychiatrist, Carmen Z. Harlan, M.D., diagnosed ADHD and Generalized Anxiety Disorder and assessed Plaintiff's GAF at forty-five. Dr. Harlan recommended that Plaintiff begin a trial of an anti-depressant and stimulant medications. (R. 202.) Dr. Harlan further recommended that a plan for long term care be developed and individual treatment be provided. (R. 202.) Risperdal and Paxil were prescribed by Dr. Harlan. (R. 206.)

On September 19, 2002, a Psychological Evaluation/Admission Assessment Summary was completed at Wordsworth Academy by Linda Greenberg, M.A., Licensed Psychologist. (R. 206–209.) Plaintiff was again diagnosed with ADHD and Generalized Anxiety Disorder and was assessed a GAF of forty-five. (R. 206–209.) During the evaluation, Plaintiff reported that he sees "shadows peeking about" and sees "images of the devil," but "these [were] viewed as more likely related to anxiety of a child rather than visual hallucinations." (R. 208.) Fears related to sleeping, impulsivity, defensiveness, insecurity, and "issues of separation from mother" were observed. (R. 207–208.) Dr. Greenberg noted that Plaintiff's "fixation with death and comments of suicidality also bear further attention." (R. 209.) As such, Dr. Greenberg recommended that Plaintiff "be admitted into a partial hospital [afterschool] treatment program," up to five days per week. (R. 209.) Further, "ongoing outpatient therapy with medication management" was also recommended to address Plaintiff's "emotional ups and downs" and his hyperactivity. (R. 209.)

A treatment note dated January 14, 2003, states that Plaintiff's mother reported depression, crying spells, low self-esteem, extreme worry, and complaints of headaches and stomachaches. (R. 210–

211.) Reportedly, Plaintiff "sometimes says he hates his life." (R. 210.) At this time, Plaintiff was very angry, because his mother and stepfather were separating. (R. 211.) Additionally, Plaintiff's grades were beginning to fall and his concentration was poor. (R. 210.) Plaintiff's medications at this time were Paxil and Risperdal. (R. 211.) The examining physician found that Plaintiff's speech was soft but spontaneous; his though process was coherent; and his mood was sad/anxious. (R. 214.) Plaintiff was diagnosed with Depression and Anxiety and was assessed a GAF of forty to forty-five. (R. 215.) Admission to Wordsworth was recommended. (R. 215.)

On March 29, 2003, less than one month after the administrative hearing, Plaintiff was admitted on an inpatient basis to Friends Hospital after he exhibited uncontrolled physical and verbal aggression. (R. 224.) Upon admission, Plaintiff was diagnosed with Psychotic Disorder NOS was assessed a GAF of twenty-five. (R. 224.) Plaintiff remained hospitalized for nine days. (R. 222–224.) Upon discharge, Plaintiff's diagnosis was ADHD, Oppositional Defiant Disorder, and Anxiety Disorder, and his GAF was assessed at sixty. (R. 222.) Plaintiff's GAF in the past year was reported to be sixty. (R. 222.) Plaintiff was prescribed Zoloft, Strattera, and Risperdal, and he was scheduled to return to school. (R. 222.)

At the administrative hearing, both Plaintiff and his mother testified. (R. 231–255.) Ms. Rios testified that she had some training and background in the mental health profession in her experience as a peer support specialist for the Mental Health Association. (R. 244–25.) Ms. Rios testified that Plaintiff and his three year old sister love each other, but they fight a lot. (R. 231.) Ms. Rios testified that Plaintiff thinks his sister does things to him on purpose, and he does not understand that some of the things his little sister does are because she is only three years old. (R. 232.) Ms. Rios testified that Plaintiff can be very mature, but he often acts like he is five. (R. 232.) She testified that no matter how much love he gets, "it's not enough." (R. 233.) Ms. Rios testified that "one minute [Plaintiff] could be fine. The next minute he's screaming and hollering and throwing himself all over the floor." (R. 233.) Ms. Rios testified that Plaintiff's eleven year old friend is very patient with Plaintiff and constantly tells him "you know, get it together." (R. 233.) Ms. Rios testified that she believes Plaintiff is verbally abusive to the other children at school. (R. 234.) Plaintiff's mother testified that she sought psychiatric help for Plaintiff when he was about three years old, because she needed to learn how to cope with his problems. (R. 234.) Ms. Rios testified that last summer, 2002, Plaintiff was "hearing voices coming out of the TV, and he didn't want to live, and was severely depressed, and crying spells, and a lot of tantrums." (R. 234.) Ms. Rios testified that during this time, Plaintiff was not immediately admitted to the hospital, because he was very attached to his mother and an in-patient program would only worsen his symptoms at that time. (R. 235.) Ms. Rios testified that Plaintiff was currently seeing a therapist about once per week. (R. 236.)

Ms. Rios testified that in preparation for the hearing, she told her son that he was going to be asked some questions, and she was surprised when he wanted to know if "they going to [sic] ask me question like when I feel like I want to kill myself?" (R. 237.) Ms. Rios testified that she did not "want her son to be out there on the street when he gets big because he didn't get the proper help." (R. 238.) Ms. Rios was mainly concerned with the way Plaintiff "sees himself" and "the fact that, you

know, he doesn't want to live." [3] (R. 242.) Ms. Rios stated that Plaintiff has a lot of things worrying him; he is always scared and he was very unstable. (R. 242.) Ms. Rios felt that her son was an intelligent boy, that he could succeed, and there was hope for him, but she did not know how to do it on her own. (R. 241, 245.) Ms. Rios testified that Plaintiff took his medication as prescribed and on time. (R. 240.)

Though each sentence of the transcript of the administrative hearing will not be reiterated in this Report, it should be noted that the entire transcript of the administrative hearing was reviewed by this Court, and Ms. Rios' maturity, insight, and sincere desire to help her son were expressed throughout her testimony. (R. 231–245.)

## LEGAL STANDARD

Judicial review of the Commissioner's final decision is limited, and this Court is bound by the factual findings of the Commissioner if they are supported by substantial evidence and decided according to correct legal standards. 42 U.S.C. § 405(g); *Allen v. Bowen,* 881 F.2d 37, 39 (3d Cir.1989); *Coria v. Heckler,* 750 F.2d 245, 247 (3d Cir.1984). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)(quoting *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)); *see also Williams v. Sullivan,* 970 F.2d 1178, 1182 (3d Cir.1992), *cert. denied,* 507 U.S. 924, 113 S.Ct. 1294, 122 L.Ed.2d 685 (1993). It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance of the evidence. *See Cotter v. Harris,* 642 F.2d 700 (3d Cir.1981).

Despite the deference to administrative decisions implied by this standard, the Court retains a responsibility to scrutinize the entire record and to reverse or remand if the Commissioner's decision is not supported by substantial evidence. *Smith v. Califano,* 637 F.2d 968, 970 (3d Cir.1981) (citations omitted). Substantial evidence can only be considered as supporting evidence in relationship to all other evidence in the record. *Kent v. Schweiker,* 710 F.2d 110, 114 (3d Cir.1983) (citing *Cotter,* 642 F.2d at 706).

In considering a child's claim for disability, the ALJ proceeds through a three-step sequential evaluation process as follows: (1) if the claimant is engaging in substantial gainful activity, a finding of not disabled is directed; (2) if the claimant's impairment is a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations, then a severe impairment does not exist and a finding of not disabled is directed; and (3) in order to be found disabled, a claimant's impairment must meet, medically equal, or functionally equal in severity, a listed impairment. 20 C.F.R. § 416.924.

To satisfy the "functionally equivalent" standard, the claimant must show that he suffers from "no less than two marked limitations" or one "extreme limitation" within the listed areas of development of functioning. The areas of development of functioning are called "domains of functioning." 20 C.F.R. § 416.924. The six domains within which a child's functional limitation must be evaluated are: (1) Acquiring and Using Information; (2) Attending and Completing Tasks; (3) Interacting and Relating With Others; (4) Moving About and Manipulating Objects;

**3.** When the ALJ asked Plaintiff if he really feels like killing himself, Plaintiff responded "yeah." (R. 248.)

(5) Caring for Yourself; and (6) Health and Physical Well–Being. *See* 20 C.F.R. § 416.926a(b)(1)(i)-(vi).

In considering a child's claim for disability, the ALJ considers all relevant evidence including medical evidence, test scores, school records, and information from people who know the child and can provide evidence about functioning, such as the child's parents, caregivers, and teachers. 20 C.F.R. § 416.924a.

### ALJ'S DECISION AND PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff alleges disability due to mental impairments. (R. 16–26, 47–51.) In this case, the ALJ found Plaintiff was not disabled by his mental impairments at step three.[4] (R. 25–26.)

In his Motion for Summary Judgment, Plaintiff asserts that the ALJ erroneously failed to offer a reasoned analysis to support his conclusion that Andre's impairments were not functionally equivalent to those of a listed impairment and that the ALJ should have found marked limitation in the areas of Attending and Completing Tasks, Caring for Yourself, and Health and Physical Well–Being. The sole issue before this Court, however, is whether the Commissioner's final decision of "not disabled" should be sustained as being supported by substantial evidence. With regard to our review of Plaintiff's claims, the various sources of medical evidence, the teacher questionnaires, the submissions of counsel, and the testimony at the administrative hearing were consulted.

Based on this Court's independent and thorough review of the record and for the reasons that follow, we find that the ALJ's decision was not fully supported by substantial evidence of record. We will, therefore, recommend that Plaintiff's Motion for Summary Judgment be granted in part and the matter be remanded.

### DISCUSSION

In his decision, the ALJ provided a full explanation of the three step sequential evaluation process, as well as a detailed review of the six functional domains and the factors used when evaluating a child's functioning under the six domains. (R. 16–19.) The ALJ then undertook a thorough review of Plaintiff's medical records, as well as teacher questionnaires and the

---

4. The ALJ made the following findings:

1. The claimant is eleven years of age.

2. The claimant has been medically diagnosed with Attention Deficit Hyperactivity Disorder, Generalized Anxiety Disorder, and Oppositional Defiant Disorder, which are "severe" impairments. His asthma is controlled or in remission, and is not severe.

3. The subjective complaints of the claimant's parents are not reasonably supported by the evidence of record.

4. The limitations resulting from the effects of the claimant's alleged impairments do not meet, medically equal, or functionally equal the criteria of any listed impairment(s) in Appendix 1, Subpart P, of Regulations No. 4.

5. The claimant does not have medically determinable impairments, physical or mental, that result in two "marked" or one "extreme" functional limitation(s).

6. Since January 9, 2002, the claimant has had less than marked limitations in five of the six domains of functioning. In one domain, that of "Interacting and Relating with Others," the claimant has demonstrated episodic functional limitations, and his functional limitation in this domain can be termed "marked."

7. Since January 9, 2002, the claimant's impairments, singly or in combination, have not been functionally equal in severity to a listed impairment in the Listings of Impairment to Appendix 1, Subpart P, of Regulation No. 4.

8. Since January 9, 2002, the claimant has not been "disabled" as defined in the Social Security Act (20 C.F.R. 416.924).

9. The claimant is not eligible to receive Supplemental Security Income payments at any time relevant to this decision.

testimony at the administrative hearing. (R. 19–24.) However, the ALJ only dedicated one paragraph to discuss application of the process that he so carefully outlined. (R. 25.) Though the ALJ made a specific finding about Plaintiff's functioning under each of the six domains, the ALJ failed to provide a full and reasoned analysis for each of these findings. (R. 25.) Thus, this Court is unable to determine whether the ALJ's findings are based on substantial evidence. Moreover, because Plaintiff specifically cited objections to the ALJ's conclusions regarding three of the six domains,[5] and because there is evidence to support a finding of a greater degree of impairment than the ALJ found within these three domains, the matter must be remanded for further proceedings.[6]

A. *Attending and Completing Tasks*

 Plaintiff argues that the ALJ should have found that Plaintiff exhibited marked impairment in the domain of Attending and Completing Tasks. (Pl.Br.10–12.) In the domain of Attending and Completing Tasks, the ALJ must consider:

> how well you are able to focus and maintain your attention, and how well you begin, carry through, and finish your activities, including the pace at which

you perform activities and the ease with which you change them.

20 C.F.R. § 416.926a(h). The regulations require that the ALJ compare the functioning of the claimant to the functioning of children the claimant's age who do not have impairments. *See* 20 C.F.R. § 416.926a(f). In this case, the ALJ merely concluded that Plaintiff "has exhibited weakness in the area of Attending and Completing Tasks; however his limitations in this area are not 'marked.'" (R. 25.) The ALJ offered no further explanation or analysis to support his conclusion and provided no comparison to other children Plaintiff's age. (R. 16–26.)

 It is the ALJ's duty to compare the functioning of the claimant to the functioning of children the claimant's age who do not have impairments. *See* 20 C.F.R. § 416.926a(f). To assist in that process, the Regulations list five examples of limited functioning in the domain of Attending and Completing Tasks.[7] *See* 20 C.F.R. § 416.926a(h)(3). Of the five listed examples, Plaintiff has exhibited symptoms similar to at least three of the listed examples. For instance, Plaintiff repeatedly becomes sidetracked from his activities and frequently interrupts others. *See* 20 C.F.R.

---

5. Though the ALJ found Plaintiff exhibited marked limitations only in the domain of Interacting and Relating with others, Plaintiff argues that he has also demonstrated marked limitations in the domains of Attending and Completing Tasks, Caring for Yourself, and Health and Physical Well–Being. (Pl.Br.10–18.)

6. Plaintiff would be entitled to benefits if it were found that he had marked limitations in two or more domains; therefore, the ALJ must clarify his position on Plaintiff's level of functioning within the domains discussed *infra.*

7. The following examples describe some limitations that may be considered in the domain of Attending and Completing Tasks:

(i) You are easily startled, distracted, or overreactive to sounds, sights, movements, or touch.

(ii) You are slow to focus on, or fail to complete activities of interest to you, e.g., games or art projects.

(iii) You repeatedly become sidetracked from your activities or you frequently interrupt others.

(iv) You are easily frustrated and give up on tasks, including ones you are capable of completing.

(v) You require extra supervision to keep you engaged in an activity.

20 C.F.R. § 416.926a(h)(3).

§ 416.926a(h)(3)(iii). A Teacher Questionnaire from Plaintiff's fifth grade teacher, Miriam Torres, states that Plaintiff becomes sidetracked from his activities in that he only "completes classroom assignments with [Ms. Torres'] support/encouragement," and he does not complete home assignments. (R. 114B.) Ms. Torres also reported that Plaintiff interrupts others, or talks out of turn, when he raises his hand to ask a question and "continue[s] asking one after another. Oftentimes the questions make the students upset." (R. 114B.) Additionally, a Function Report completed by Ms. Rios states that Plaintiff "doesn't complete the job at hand. He bores easily." (R. 81.) Ms. Rios further reported that Plaintiff "has a hard time interacting with [his sister] . . . he's very impatient." (R. 82.) Finally, Plaintiff's therapist noted "continue[d] problems with behavior, demanding, not listen." (R. 128.) This evidence of record demonstrates Plaintiff's tendency to become sidetracked and interrupt others.

Next, this Court notes that Plaintiff has exhibited being easily frustrated and giving up on tasks, including ones he is capable of completing. *See* 20 C.F.R. § 416.926a(h)(3)(iv). As states *supra,* Plaintiff has demonstrated his ability to complete homework assignments through his success with classroom assignments, but he gives up on completing them at home. (R. 114B.) Plaintiff testified to the feeling of frustration that prevents him from completing his homework. Plaintiff testified that "I get so mad because I don't know what questions do [sic]. I just forget everything. And I just move on." (R. 247.) Ms. Rios testified that when engaged in an activity, Plaintiff will "do that for a little while, then he'll get up and do something else. Then he'll do something else. Everything that he does he leaves undone." (R. 241.) Additionally, Ms. Rios described Plaintiff's behavior of becoming easily frustrated when she testified that as often as three times per day Plaintiff will "throw a tremendous temper tantrum . . . crying, 'I'm tired of my life' and 'I just can't get it right.'" (R. 237.)

Next the Court notes that, like Plaintiff's tendency to give up on tasks, Plaintiff also requires extra supervision to keep him engaged in an activity. *See* 20 C.F.R. § 416.926a(h)(3)(v). As noted *supra,* Plaintiff requires the attention and supervision of his teacher or parent to keep him engaged in his school assignments. (R. 114B.) Additionally, Plaintiff explained that he failed to complete his social studies homework because he had no one to help him with it. (R. 248.) Plaintiff testified that since he has no one to do it with him, he just does not do it

> because it's like what's the use if you don't have nobody to help you, because—this goes here so why don't you put this over there. So if you're not going to do that, how will you know what to do?

(R. 248.) Plaintiff, thus, stated that he failed to complete his assignments, because he needed someone to work on it with him to show him how to complete the assignment.

In sum, the record shows that Plaintiff repeatedly becomes sidetracked from his activities and frequently interrupts others; he is easily frustrated and gives up on tasks, including ones he is capable of completing; and he requires extra supervision to keep him engaged in an activity. Thus, Plaintiff exhibits a continued pattern of difficulty with Attending and Completing Tasks. It is the opinion of this Court that the ALJ should have at least discussed these facts and come to a reasoned conclusion based on these and other facts of record. The ALJ's failure to explain how these behaviors do or do not rise to the level of a marked impairment in Attending and Completing Tasks warrants remand.

### B. *Caring for Yourself*

■ Plaintiff argues that the ALJ should have found that Plaintiff exhibited marked impairment in the domain of Caring for Yourself. (Pl.Br.14–16.) In the domain of Caring for Yourself, the ALJ must consider:

> how well you maintain a healthy emotional and physical state, including how well you get your physical and emotional wants and needs met in appropriate ways; how you cope with stress and changes in your environment; and whether you take care of your own health, possessions, and living area.

20 C.F.R. § 416.926a(k). Caring for Yourself

> depends upon your ability to respond to changes in your emotions and the daily demands of your environment to help yourself and cooperate with others in taking care of your personal needs, health and safety. It is characterized by a sense of independence and competence.

20 C.F.R. § 416.926a(k)(1)(i). In this case, the ALJ merely concluded that Plaintiff does not have marked limitations in the domain of Caring for Yourself. (R. 25.) The ALJ offered no further explanation or analysis to support his conclusion. (R. 16–16.) Having reviewed the evidence of record, this Court cannot find substantial evidence in support of the ALJ's conclusion.

As with the domain of Attending and Completing Tasks, this Court has carefully reviewed the evidence of record and we find a variety of examples of Plaintiff's

inability to care for himself as a child of his age should. The Regulations state that an ability to Care for Yourself requires "effective coping strategies, appropriate to your age, to identify and regulate your feelings, thoughts urges, and intentions." 20 C.F.R. § 416.926a(k)(1)(ii). However, the record shows that Plaintiff does not possess effective coping strategies for a child of his age.[8] Further, the record demonstrates that Plaintiff is often unable to identify his thoughts and feelings.[9] Finally, the Regulations specifically state that the ALJ must consider how the child copes with stress and changes in his environment. *See* 20 C.F.R. § 416.926a(k). Clearly this child has demonstrated marked difficulty in dealing with changes in his environment.[10] The ALJ acknowledged that Plaintiff's childhood was fraught with anxiety and fear of separation from his mother due having witnessed domestic violence; however, the ALJ failed to account for these facts in coming to a reasoned analysis of Plaintiff's ability to function in the domain of Caring for Yourself. The ALJ's failure to explain how Plaintiff's behaviors do or do not rise to the level of a marked impairment in Caring for Yourself warrants remand.

### C. *Health and Physical Well–Being*

■ Plaintiff argues that the ALJ should have found that Plaintiff exhibited marked impairment in the domain of Health and Physical Well–Being. (Pl. Br.17–18.) In the domain of Health and Physical Well–Being, the ALJ must consider:

---

**8.** Ms. Rios reported that Plaintiff's eleven year old playmate constantly has to remind Plaintiff to "get it together." (R. 233.) Ms. Rios also described Plaintiff's temper tantrums and how his behavior pushes his friends away. (R. 233, 237.)

**9.** Ms. Rios testified that "sometimes I think he doesn't even know what he feels and I feel he's frustrated." (R. 240.)

**10.** When faced with domestic abuse and the separation of his parents, Plaintiff's mental well-being deteriorated to the extent that he required in-patient hospitalization for more than a week. (R. 219–227.)

the cumulative physical effects of physical or mental impairments and their associated treatments or therapies on your functioning that we did not consider in paragraph (j) [11] of this section.

20 C.F.R. § 416.926a($l$). The Regulations list examples of limitations in Health and Physical Well–Being. One example of a limitation in Health and Physical Well–Being is having "somatic complaints related to your impairments," including changes in weight or eating habits, stomach discomfort, headaches, or insomnia. *See* 20 C.F.R. § 416.926a($l$)(4)(ii).

Having independently and thoroughly reviewed the evidence of record, this Court finds that Plaintiff has, indeed, exhibited some indication of limitations in Health and Physical Well–Being in that. Plaintiff continually complained of stomachaches, headaches, and insomnia. (R. 151, 171–174, 207–208, 210–211.) Unfortunately, the ALJ failed to provide a reasoned analysis for his conclusion that Plaintiff was not markedly limited Health and Physical Well–Being. Therefore, this Court is unable to determine whether or not the ALJ considered Plaintiff's reports of stomachaches, headaches, and insomnia in making his decision. Accordingly, the matter must be remanded for further consideration and explanation on this issue as well.

Additionally, upon reviewing the reported domestic violence against Ms. Rios and the impending divorce of Plaintiff's mother and step-father, the ALJ stated that Plaintiff "has had, in essence, a childhood that has engendered anxiety and fear of separation from his mother." (R. 24.) While this statement may hold some truth, it is unclear if the ALJ intends to imply that Plaintiff would not have a problem but for the difficult *circumstances* of his life. Indeed, Plaintiff himself often told his therapist and his mother that he hated his life. (R. 210, 237, 248.) Thus, all persons involved, including Plaintiff, his caregivers, and the ALJ, all acknowledge that the circumstance of Plaintiff's childhood have played a role in his emotional and medical well-being. However, the fact that these circumstances exist do not make Plaintiff any less unwell. Outside factors may be contributing to· Plaintiff's illness, but the impact of Plaintiff's often unstable home life cannot be discounted merely because such circumstances do not exist for every child.

Finally, the ALJ states that "the need for additional parental oversight is indicated." (R. 25.) This Court has found no evidence of neglect or disregard for Plaintiff's health and well-being by his mother. Rather, Ms. Rios expressed her ongoing concern for her child, she took him to therapy sessions, she applied for benefits on his behalf, she administered medications,[12] she was familiar with his academic performance, she knew who his friends were, she helped him with his homework, and she allowed him to sleep in

---

11. Section (j) addresses Moving About and Manipulating Objects. In section (j), the ALJ must consider how you move your body from one place to another and how you move and manipulate things. These are called gross and fine motor skills. *See* 20 C.F.R. § 416.926a(j).

12. As the ALJ points out, there was some indication in the record that Ms. Rios stopped giving Plaintiff his medication at some point. (R. 24.) However, as Ms. Rios testified, Plaintiff did not respond to Adderall when first prescribed, and he became hyper on Ritalin, so Ms. Rios discontinued the Ritalin and "took him to a new psychiatrist at Child Psychiatry Center." (R. 234.) Additionally, Ms. Rios stated that she was aware of the "trauma" your body goes through "if you stop a medication." (R. 235.) Finally, Ms. Rios testified that Plaintiff took his medication on time and as prescribed. (R. 235, 240.) Thus, it appears that Ms. Rios made every effort to maintain a proper treatment regime for her son.

her bedroom at night due to his anxiety about sleeping. (R. 231–245.) Indeed, the ALJ commended Ms. Rios for "seeing to it that the claimant has medical and psychiatric treatment." (R. 24.) Again, it is unclear to this Court if the ALJ was disinclined to award benefits based on his perception of the level of care administered by Plaintiff's mother. If such factors come into play in the ALJ's decision, it should be well articulated at least for purposes of review by this Court.

Therefore, I make the following:

### RECOMMENDATION

AND NOW, this day of February, 2005, IT IS RESPECTFULLY RECOMMENDED that the Plaintiff's Motion for Summary Judgment should be GRANTED in part, the Defendant's Motion should be DENIED, and the matter should be remanded for further proceedings.

February 4, 2005.