

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-1-2007

# Cosby v. Comm Social Security

Precedential or Non-Precedential: Non-Precedential

Docket No. 06-3157

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Cosby v. Comm Social Security" (2007). *2007 Decisions.* Paper 1146.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1146

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Case No.: 06-3157

RHASHONNA COSBY O/B/O ASHLEY GRIEVES,

Appellant

v.

COMMISSIONER OF SOCIAL SECURITY

_____

On Appeal from the United States District Court
for the District of New Jersey
District Court No.: 05-cv-03318
District Judge: The Honorable Jose L. Linares
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
April 13, 2007

Before: SMITH and COWEN, *Circuit Judges*,
and YOHN, *District Judge\**

(Filed: May 1, 2007)

_____

OPINION
_____

 

 

*The Honorable William H. Yohn Jr., Senior District Judge for the Eastern District
of Pennsylvania, sitting by designation.

YOHN, *District Judge*.

Rhashonna Cosby, on behalf of her niece, Ashley A. Grieves, appeals the May 4, 2006 Order of the United States District Court for the District of New Jersey affirming the Commissioner of Social Security's denial of Ashley's application for child Supplemental Security Income ("SSI") benefits. The District Court had jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3). We have jurisdiction to review the final order of the District Court under 28 U.S.C. § 1291. For the following reasons, we will affirm.

## I. Background

On March 4, 2003, Cosby filed an application for SSI benefits on behalf of Ashley, claiming Ashley became disabled on February 12, 2003 due to diabetes mellitus and a learning disability. The application was denied initially and upon reconsideration. Subsequently, Cosby filed a request for a hearing before an Administrative Law Judge ("ALJ"), which was held on October 20, 2004.

## A. Evidence Presented

Cosby presented evidence of Ashley's medical and school records; teacher, school psychiatric, and state agency evaluations; and parent forms showing that Ashley had a learning disability and type I or juvenile diabetes mellitus ("diabetes mellitus").

## 1. Medical Reports

On February 12, 2003, Ashley visited her doctor[1] with complaints of fatigue,

---

[1]The name of the doctor who examined Ashley on this date is indecipherable.

constant thirst and frequent urination. (R. at 162.) Her doctor referred her to the hospital. (*Id.*) Ashley went to the hospital that same day complaining of fatigue, stomach pain, and weight loss. (*Id.* at 66.) She received a diagnosis of diabetes mellitus. (*Id.*)

On May 8, 2003, Ashley saw Dr. Lauren Lipeski for a follow-up examination at the Pediatric Diabetes Clinic. (R. at 178-79.) Dr. Lipeski noted that Ashley had "excellent glycemic control" and that she was in the "honeymoon period" of her diabetes mellitus. (*Id.* at 179.) Dr. Lipeski advised that cutting Ashley's insulin in half, but not withholding it completely, would help prolong Ashley's "honeymoon period." (*Id.*)

In a one-page letter to Cosby's attorney dated September 23, 2004, Dr. Caryn Borger, Ashley's primary care physician, wrote that Ashley's diabetes was "under reasonable control" with "significant amounts of insulin" and blood sugar testing eight times a day. (R. at 235.) Dr. Borger continued, "[Ashley] currently has no complications of diabetes mellitus and that is mostly attributable to the fact that she takes significant efforts to care for herself and for her diabetes mellitus with the help of . . . Cosby." (*Id.*)

**2. School Records; Teacher Evaluations; School Psychiatric Evaluation**

In her March 2002 achievement tests, Ashley placed in the national average in the area of science, but below average in reading, language, mathematics and social studies. (R. at 153.) On November 19, 2002, Ashley's language arts teacher, Ms. Beriant, referred Ashley for intervention and referral services due to academic problems. (R. at 120-21.) In her referral report Ms. Beriant noted that Ashley sucked her thumb in class, was very quiet, had poor oral reading skills, and turned in homework poorly done with

3

poor spelling and sentence construction. (*Id*. at 120.) Ms. Beriant also observed that Ashley was not a "behavior problem" and appeared to be trying to stay focused. (*Id*. at 121.)

In response to Ms. Beriant's referral for intervention, a number of Ashley's teachers submitted questionnaires regarding Ashley's academic performance. (R. at 122-47.) Ms. Beriant elaborated on her initial referral and estimated Ashley's reading ability to be at a fourth-grade level. (*Id*. at 132.) She noted that Ashley did not complete homework, lacked the desire to do well in school, and appeared unhappy. (*Id*. at 132-33.) Ashley's mathematics teacher, Ms. Morris, reported that Ashley had "extremely poor" mathematical skills, gave up easily, and did not ask for help when needed. (*Id.* at 129.) She also observed that Ashley lacked self-confidence, received frequent ridicule from her classmates, and sucked her thumb in class. (*Id.* at 130.) She further stated that Ashley was a very sweet child and never disrespectful. (*Id*. at 131.) Mr. Ventura, Ashley's social studies teacher, reported that she had the ability to do the work, but that her study habits needed improvement. (*Id*. at 135.) He also observed that she had a difficult time sitting still, distracted other students, and sucked her thumb. (*Id*. at 136-37.) Ashley's science teacher, Ms. Cahill, highlighted Ashley's eighty-five average and cooperative work, but noted that her test scores were getting worse. (*Id*. at 138.) Ms. Cahill had also noticed that Ashley sucked her thumb when she was nervous (*id*. at 139), and that Ashley was a sweet child who worked hard (*id*. at 140). Finally, Ashley's gym teacher, Ms. Palmieri, stated that Ashley had ability but did not apply herself, and that she became

4

noisy at inappropriate times.  (*Id*. at 142.)  For the most part, however, Ms. Palmieri

thought Ashley was well-behaved.  (*Id*. at 143.)

On January 15, 2003, Ashley was referred for a special education evaluation.  (R.

at 118.)  On February 24, 2003, Ms. Adams of Pupil Personnel Services evaluated Ashley

to determine if she had a learning disability.  (*Id*. at 67.)

On April 6, 2003, Ms. Beriant completed a teacher questionnaire for the Division

of Disability Determination Services.  (R. at 170-77.)  She noted that Ashley had obvious

problems in the areas of acquiring and using information; some problems in attending and

completing tasks; and no problems in moving about and manipulating objects, and caring

for herself.  (*Id.* at 171-75.)  She also reported that Ashley was involved in the school's

language arts basic skills program.  (*Id.* at 171.)

On June 10, 2003, Michael Petti, a school psychologist, evaluated Ashley in order

to determine whether she qualified for special education services due to her academic

difficulties.  (R. at 181-84.)  The techniques employed by Dr. Petti included a Bender

Visual-Motor Gestalt ("Bender") test,[2] a Wechsler Intelligence Scale for Children - III

("WISC-III"), adaptive behavior and personality interviews, sentence completions, and a

functional assessment.  (*Id*. at 181.)  Dr. Petti also reviewed Ashley's available records.

(*Id*.)  Dr. Petti observed Ashley was natural, pleasant, attentive and cooperative.  (*Id*.)

Ashley's WISC-III test revealed an overall intellectual functioning in the low average

---

[2]A Bender Visual-Motor Gestalt test is a psychological test that measures a person's ability to visually copy a set of geometric designs.  *Stedman's Medical Dictionary* 1799 (27th ed. 2000).

range–her verbal intellectual functioning was in the low average range while her non-verbal intellectual functioning was in the average range. (*Id*. at 182.) Ashley earned verbal and full-scale IQ scores of eighty-nine (low average) and a performance IQ score of ninety-one (average range). (*Id*.)

Additionally, Dr. Petti noted Ashley's Bender test results showed that her ability to coordinate eye and hand movements was akin to "that of a child between 8 years, 6 months and 8 years, 11 months old." (R. at 183.) Dr. Petti elaborated that Ashley's copies of designs were "all clearly recognizable," but she made "a few errors expected of younger children." (*Id*.) Dr. Petti noted the educational implications of Ashley's Bender test: "Ashley may have poor spacing of letters and words with print or script, and may have some difficulty in alignment of columns and rows." (*Id*.)

Dr. Petti also did not believe that Ashley's difficulties in school were due to emotional problems. (R. at 183.) In this regard, he pointed to Ashley's thumbsucking, but he commented that "[t]his seems to be nothing more than a bad habit she acquired." (*Id*.) Further, he observed Ashley had positive feelings towards her aunt and saw her home environment as warm and secure, even though, as a teenager, she might assert some rebellion by disobeying occasionally. *(Id*.)

In a meeting held on July 30, 2003, the Linden Board of Education's Department of Special Services ("the Department") found that, based on results of individually-administered standardized tests, teacher reports, a curriculum-based assessment and classroom observations, Ashley had a specific learning disability in the areas of

mathematics and comprehension. (R. at 199-234, 201-03.) The Department further concluded that she was eligible for special education placement. (*Id*. at 203.) The Department determined there were no educationally relevant medical findings, that her school attendance was very good, and that her daily schedule included two planned visits to the school nurse for a snack and blood-sugar testing. (*Id.* at 201.)

### 3. State Agency Evaluations

On June 26, 2003, state agency physician Benito Tan, M.D., a psychiatrist, completed a Childhood Disability Evaluation Form. (R. at 185-90.) Dr. Tan concluded that Ashley's learning disability and diabetes mellitus were severe impairments, but did not meet, medically equal or functionally equal the listings. (*Id*. at 185, 190.) Dr. Tan opined that Ashley's impairments caused no limitations on her abilities to move about and manipulate objects, to interact and relate with others, and to care for herself. (*Id*. at 188-89.) Dr. Tan observed that Ashley's impairments resulted in a less than marked limitation on her health and physical well-being as the medical evidence revealed she had good glycemic control and did not need psychiatric treatment or medication. (*Id*. at 188.) Further, Dr. Tan reported that Ashley's impairments, as a poor oral reader with poor decoding skills and low average WISC-III test results, led to a less than marked capacity to acquire and use information. (*Id*. at 189-90.) Finally, Dr. Tan assessed that Ashley had a less than marked limitation with respect to attending and completing tasks because she showed a slight problem with attention, focus, completion and pace. (*Id*. at 189.) On September 16, 2003, Dr. J. Randall reviewed all the evidence in Ashley's file and

affirmed Dr. Tan's assessment as written. (*Id.* at 186.)

On July 16, 2003, state agency physician Samuel Kaye, M.D., a pediatrician, completed a Childhood Disability Evaluation Form. (R. at 191-96.) Dr. Kaye concluded that although Ashley's diabetes mellitus is a "very significant" impairment and "close monitoring is essential," there had not been any episodes of diabetic ketoacidosis ("DKA"), hypoglycemia or kidney problems since the original diagnosis. (*Id.* at 191.) Dr. Kaye opined that Ashley's diabetes mellitus was "happily under control." (*Id.*) On September 16, 2003, Dr. Randall affirmed Dr. Kaye's assessment as written. (*Id.* at 192.)

**4. Cosby's Parent Forms**

As part of Ashley's application for SSI benefits, Cosby completed various forms, questionnaires and reports. (R. at 55-63, 91-96, 63-73, 74-82, 83-90, 125-28.) With regard to Ashley's diabetes mellitus, Cosby stated that at any time, Ashley could have high or low blood sugar levels, which had "various effects on her condition" (*id.* at 64), including pain and fatigue about two times a week, lasting thirty minutes to one hour (*id.* at 84). Cosby reported Ashley might also experience shaking, lightheadedness and blurred vision, but rest and glucose would relieve these symptoms within twenty minutes. (*Id.* at 90.) Cosby further represented that Ashley's medications seemed to "work well" (*id.* at 60) and that her diabetes mellitus did not limit Ashley's physical abilities, social activities or behavior with other people (*id.* at 78-79). Regarding Ashley's learning disability, Cosby stated Ashley did not learn at her grade level and was behind the other children in her class. (*Id.* at 64.) She stated that Ashley had difficulty with learning and

8

concentration, and that she sometimes forgot instructions. (*Id.* at 77, 81, 94.)

Cosby also praised Ashley for her artistic and helpful nature, and she noted that Ashley functioned well with hands-on and practical tasks. (R. at 125.) She reported that Ashley helped care for her baby cousin, helped at home, emptied the trash, washed dishes, prepared sandwiches, snacks and beverages for herself, took care of her own personal hygiene and "kept out of trouble." (*Id.* at 80, 94, 126.)

### 5. Ashley's and Cosby's Testimony

At her hearing before the ALJ, Ashley testified that her favorite class was algebra, but that she did not do well in it because she did not understand it. (R. at 243-44.) She testified that she had problems with concentration and memory in school, but that she liked to watch videos, play video games, and talk on the phone. (*Id.* at 245, 254-55.) Ashley also testified that when her blood sugar was very low, she would become weak, shaky, and dizzy; and that when her sugar level was high, her stomach hurt, her vision became blurred, and she felt tired. (*Id.* at 254.) Ashley stated she had these highs and lows every day. (*Id.*)

Cosby also testified at the hearing before the ALJ. Cosby reported Ashley took insulin every day and that she followed a diabetic diet. (R. at 250.)

### B. The ALJ's Decision

On November 4, 2004, the ALJ found that, based on her application of March 4, 2003, Ashley was not disabled and, therefore, was not eligible for SSI. The ALJ summarized his findings as follows:

9

1.  The claimant, a fourteen-year old child has never engaged in a substantial gainful activity.

2.  The child [has a] learning disability and insulin dependent diabetes, impairments which are "severe."

3.  The child's learning disability and insulin dependent diabetes do not meet or medically equal the severity of any impairment listed in Part B of Appendix 1 to Subpart P[.]

4.  The child does not have an "extreme" limitation in any domain of functioning, a "marked" limitation in two domains of functioning, and does not functionally equal the severity of the listings.

5.  The child has not been under a "disability," at any time from the alleged onset date through the date of this decision.

(R. at 19-20 (citations omitted).)  With regard to Ashley's functioning, the ALJ determined she had less than marked impairments in acquiring and using information, attending and completing tasks, and health and well-being.  (*Id*. at 16-19.)  The ALJ also concluded Ashley had no limitations in interacting and relating with others, moving about and manipulating objects, and caring for herself.  (*Id*.)

The Social Security Appeals Council denied Cosby's request for review on May 5, 2005, the District Court affirmed on May 4, 2006, and Cosby filed a timely appeal.

## II.  Discussion

Because the Appeals Council denied Cosby's request for review of the ALJ's decision, this court reviews the ALJ's decision as the final decision of the Commissioner.  *Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001).  We review the ALJ's application of law *de novo*, *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1191 (3d Cir. 1986), and

review the ALJ's factual findings for substantial evidence, *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992). If there is substantial evidence to support the Commissioner's findings, they are conclusive. *Williams*, 970 F.2d at 1182. The ALJ must set forth the basis for his decision, including his reasons for discounting probative evidence in the record that contradicts his findings. *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981); *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119-21 (3d Cir. 2000). Also, the ALJ must consider multiple impairments in combination if none alone qualifies as a listed impairment or its equivalent. *Burnett*, 220 F.3d at 122.

The regulations outline a three-step sequential analysis for determining whether a child is disabled.[3] 20 C.F.R. § 416.924(a)-(d). Under this analysis, a child will be found disabled if: (1) she is neither working nor engaged in substantial gainful activity; (2) she has a medically determinable impairment that is severe; and (3) the medically determinable severe impairment meets, medically equals, or functionally equals a listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. § 416.924(b)-(d). An impairment functionally equals a listed impairment if the child has "marked" limitations[4] in two domains of functioning or an "extreme" limitation[5] in one domain. 20 C.F.R. §

---

[3]Cosby refers to the functional equivalency determination as a "fourth step" in the disability analysis. However, the ALJ treats that determination as part and parcel of the third step in the analysis. This opinion utilizes the ALJ's treatment, as do the regulations.

[4]A "marked" limitation "seriously" interferes with a claimant's ability independently to initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2).

[5]An "extreme" limitation "very seriously" interferes with a claimant's ability independently to initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3).

11

416.926(a). The six domains are: acquiring and using information; attending and completing tasks; interacting and relating with others; moving about and manipulating objects; caring for yourself; and health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(iv).

On appeal, Cosby challenges the ALJ's decision at step three of the process.[6] She contends that the ALJ failed to identify the listing that came closest to matching Ashley's impairments and to discuss medical equivalence "in any manner whatsoever." (Appellant Br. 13.) Cosby also argues that the ALJ did not consider the combined effect of Ashley's impairments. She relies on *Cotter v. Harris*, 642 F.2d 700 (3d Cir. 1981) and its progeny, including *Burnett v. Commissioner of Social Security Administration*, 220 F.3d 112 (3d Cir. 2000). In *Burnett*, we found the ALJ's conclusory statement that the claimant failed to meet any listing "hopelessly inadequate" and remanded the case for a full discussion of the evidence and explanation of the ALJ's reasoning. 220 F.3d at 119-20. In a later case, *Jones v. Barnhart*, 364 F.3d 501 (3d Cir. 2004), we explained that the purpose of *Burnett* is to guarantee "sufficient development of the record and explanations of findings to permit meaningful review" of step-three determinations. *Jones*, 364 F.3d at 505 (citing *Burnett*, 220 F.3d at 120.) However, in *Jones*, we clarified that an ALJ is not required "to use particular language or adhere to a particular format in conducting his analysis," but the decision "read as a whole" must be capable of providing meaningful judicial review.

---

[6]There is no dispute that Cosby satisfies the first two steps of the analysis.

364 F.3d at 505. Thus, in *Jones*, we held that an ALJ had satisfied *Burnett* by fully analyzing the medical evidence contained in the record and explaining that analysis in an opinion, even though the ALJ did not identify the most relevant listing. *Id.* at 502, 505.

We are satisfied that the ALJ's step-three analysis with respect to medical equivalence was adequate under applicable law. Significantly, Cosby does not argue or even suggest which listing the ALJ should have applied, nor does she point to any medical evidence ignored by the ALJ that would show that Ashley's impairments medically equaled one of the listings. Moreover, in this case, the ALJ clearly evaluated the medical evidence and set forth his conclusion in an opinion that is capable of meaningful judicial review under *Burnett*. The ALJ's decision methodically analyzes Ashley's limitations with respect to the six domains based on the findings of Dr. Tan,[7] the medical evidence supplied by Dr. Borger and Dr. Lipeski, evaluations forms completed by Ashley's teachers and Dr. Petti, the parent questionnaires filed by Cosby, and

_____

[7]Cosby also argues that the only evidence cited by the ALJ on the issue of medical equivalence is Dr. Tan's opinion, and that no state agency medical reviewer saw any evidence after June 3, 2003. (Appellant Br. 17-19.) Dr. Tan concluded that Ashley's learning disability and diabetes mellitus were severe impairments, but did not meet, medically equal or functionally equal the listings. (R. at 185, 190.) However, as stated above, taken as a whole, the ALJ's opinion shows a consideration of all the medical evidence available in the record. In addition, state agency medical physicians are considered to be "highly qualified physicians . . . who are also experts in Social Security disability evaluation." 20 C.F.R. §§ 404.1527(f), 416.927(f); *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 93 n.2 (3d Cir. 2007). Further, the record reveals that state agency medical physicians did examine Ashley's file after June 3, 2003: Dr. Tan on June 26, 2003, Dr. Kaye on July 16, 2003, and Dr. Randall on September 16, 2003. (R. at 185-96.) The only additional medical evidence submitted after Dr. Randall's review and before the ALJ's decision on November 4, 2004 is Dr. Borger's September 23, 2004 letter, stating that Ashley's diabetes mellitus was under control with insulin and free from complications. (*Id.* at 235.)

testimony offered by Cosby and Ashley. Further, the ALJ plainly stated Ashley did not have "an impairment or combination of impairments that meets, medically equals or functionally equals any of the impairments listed in Appendix 1, Subpart P, or Regulation No. 4." (R. at 19.) Thus, taken as a whole, the ALJ's aforementioned digestion of the record is certainly capable of meaningful review.

Additionally, Cosby claims that the ALJ failed to support his finding that Ashley did not have an impairment that is a functional equivalent of a listing. First, she challenges his determination that Ashley's impairments caused a "less than marked" limitation on her health and physical well-being. Cosby claims that substantial evidence supports an "extreme" finding. However, the record does not show that Ashley's diabetes mellitus interfered "very seriously" with her functioning in this domain. *See* 20 C.F.R. § 416.926a(e)(3). Particularly, no medical doctor corroborates Cosby's own assessment of Ashley's health. The ALJ's "less than marked" finding is supported by substantial evidence contained in Cosby's parent forms, school reports, Dr. Lipeski's records, Dr. Borger's letter, the state agency physician evaluations, and Cosby's and Ashley's testimony.

Second, Cosby insists that Ashley had "extreme" limitations in the first and fourth domains–acquiring and using information and moving about and manipulating objects. She contends that "uncontradicted visual-motor deficits" found in Dr. Petti's report support "extreme" findings. However, the record does not show that Ashley's diabetes mellitus interfered "very seriously" with her functioning in these domains. *See* 20 C.F.R.

14

§ 416.926a(e)(3). In his report, Dr. Petti discussed Ashley's hand-eye coordination, her Bender test results, and her thumb-sucking habits. (R. at 181-84.) According to Dr. Petti, Ashley's Bender test revealed that she might have "poor spacing of letters and words with print or script" and "some difficulty in alignment of columns and rows." (*Id.*) These Bender implications, which the ALJ clearly considered in his analysis,[8] do not undermine the substantial evidence that supports the ALJ's findings with regard to the first and fourth domains. This evidence includes Ashley's clinical testing, her teacher evaluations, Dr. Tan's opinion, Cosby's parent questionnaires, and Cosby's and Ashley's testimony. Accordingly, we find that there is substantial evidence to show that Ashley did not have an impairment that is a functional equivalent of a listing.

## III. Conclusion

For the reasons set forth above, we will affirm the judgment of the District Court.

---

[8]We also reject Cosby's argument that the ALJ offended the *Cotter* doctrine by overlooking Dr. Petti's report. (Appellant Br. 20.) As discussed above, the ALJ specifically noted, "According to [Dr. Petti], Ashley may have difficulty learning because of weakness in verbal and numerical abstract reasoning, organizing and interpreting visual information." (R. at 17.) The visual findings refer to the Bender results.

16